# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3369
_____

Michael Mercier

*Petitioner*

v.

United States Department of Labor, Administrative Review Board

*Respondent*

Union Pacific Railroad Company

*Intervenor*

_____

Petition for Review of an Order of the
Department of Labor (except OSHA)

_____

Submitted: November 15, 2016
Filed: March 2, 2017

_____

Before COLLOTON, BEAM, and GRUENDER, Circuit Judges.

_____

BEAM, Circuit Judge.

Michael Mercier petitions for review of the final decision and order of the
Department of Labor's Administrative Review Board (ARB), which affirmed the

Department of Labor's Administrative Law Judge (ALJ), in Mercier's Federal Rail Safety Act (FRSA) retaliatory termination action. We deny the petition for review and affirm the ARB's final decision and order.

## I. BACKGROUND

The following facts were developed at the three-day hearing in front of the ALJ. Mercier worked for Union Pacific Railroad (UP) in Valley Park, Minnesota, for a number of years. Mercier was an engineer, trainer, and union representative, and in the course of representing employees for the union during disciplinary hearings, and at other various work times, Mercier pointed out a number of perceived safety violations throughout his employment at UP. Mercier believes this ongoing practice of reporting safety violations brought him within the ire of management, and he alleges that he was unfairly disciplined on a number of occasions. Some of these disciplinary actions were overturned when reviewed by a neutral board at a later time. Mercier's superintendent testified that Mercier did indeed report on a number of safety violations but that UP generally responded to Mercier's safety reports in an effort to keep the workplace safe. The superintendent also noted that Mercier had, on occasion, been recognized and rewarded for his safety reporting.

In June 2007, Mercier exchanged a series of text messages with coworker Michael Thomas. Mercier alleges the substance of the texts was regarding the rumor that Thomas was involved in an extramarital affair with a female coworker, Deana Symons. Symons, on the other hand, alleged that shortly after she was hired as a student conductor in March 2007, Mercier began speaking to coworkers about her and insinuated that she was having sexual relations with several coworkers. Thomas showed Symons the texts he had received from Mercier. While the exact content of the texts is not in the record, both Thomas and Symons testified that the essence of the messages was that Mercier asked who was "doing the student" and offered to buy that person some "sex powder." Symons contacted Mercier directly to tell him that

-2-

she considered his conduct to be harassing, and that he should stop. Shortly thereafter, in early July 2007, Symons also reported the text-messaging incident to the Equal Employment Office (EEO) hotline. Mercier contends he was merely trying to ward off the workplace strife that might ensue due to the alleged extramarital affair between Thomas and Symons. The UP EEO manager, Melissa Schop, investigated and confirmed the existence of the offensive text messages.

UP subsequently charged Mercier with an EEO violation and removed him from service, which was effectively a suspension, pending the outcome of an investigation and EEO hearing. During his suspension, Mercier went to Symons's home and took photos of Thomas visiting her house. Thomas and Symons both testified that Thomas was there to help Symons prepare for the upcoming EEO hearing. Symons testified that Mercier's "drive by" left her feeling scared and frightened, and she was unsure how Mercier had discovered where she lived.

Before the EEO hearing could take place, Mercier's union representative and Mercier's superintendent struck a deal allowing Mercier to return to work as long as he signed a "waiver" agreement. The conditions of this agreement were that Mercier admitted violating the EEO policy, and agreed that if he had any future EEO violations, he would waive a hearing and be immediately terminated. Mercier was also required to take an EEO class, write Symons an apology, and refrain from discussing the underlying EEO incident while at work or in any way retaliating against her or Thomas. Thus, after a thirty-day unpaid suspension and meeting the preconditions, Mercier returned to work in August 2007.

Symons expressed displeasure upon finding out that Mercier would return to work. Symons objected to Mercier's "apology" which she felt was not sincere, as the apology did not express acceptance of responsibility, but instead only expressed remorse at being caught. The leader of Mercier's EEO training session also told Schop that Mercier's attitude and statements at EEO training were a concern. In mid-

October, Mercier told another UP employee that Thomas had showed him (Mercier) a pair of Symons's underwear and Mercier commented on the size and color of the underwear. This employee asked Thomas if this was true, and Thomas denied having shown Symons's underwear to Mercier or anyone else. This employee ultimately reported the incident to Schop. Also in October, Symons reported to Schop that yet another coworker told her Mercier was complaining that Symons had falsely accused Mercier of harassment. Schop contacted this coworker via telephone, and the coworker confirmed what Symons had told Schop. During the month of October 2007, Symons made phone calls and sent emails to Schop detailing her strong concern with Mercier's actions in the workplace, and her growing fears of him. Thomas reported to Schop that Mercier had been calling him a rat, and noted a derogatory message posted to the union website which obliquely referenced the summer EEO incident wherein Mercier was suspended.

Schop testified that while investigating whether a violation of Mercier's waiver agreement had occurred, she became increasingly concerned about Symons's anger and frustration with UP over the handling of the situation. Schop stated that her number one concern was that the work environment was free of discrimination and retaliation for both Symons and Thomas. Also, Schop feared that Symons would ultimately hire a lawyer and file suit against UP if it did not take prompt effective action to remedy known harassment. Because the actions UP had previously taken against Mercier did not seem to work, and because she believed Mercier had violated the waiver agreement, in late October, Schop determined that UP needed to terminate Mercier's employment.

On November 5, 2007, UP officially terminated Mercier for violating the waiver agreement. Mercier contested the dismissal through the union procedures, and a collective bargaining agreement (CBA) arbitration was scheduled about the matter. Although UP's counsel was concerned about the strength of UP's arbitration case, counsel testified that there were three reasons why UP defended the arbitration (rather

than simply returning Mercier to work): it believed Mercier committed retaliation in violation of the waiver agreement; it wanted to support female workers like Symons; and it was concerned Symons herself would file an EEO charge against the company if Mercier continued on the job. Ultimately, the arbitrator ruled in favor of Mercier, who returned to work, after all of the arbitration proceedings and appeals, on April 1, 2010.

On March 27, 2008, before his eventual reinstatement, Mercier filed the current FRSA complaint with Occupational Safety and Health Administration (OSHA), alleging that his termination for violating the waiver agreement was really a pretext for retaliation against him for the numerous times he reported safety issues. OSHA dismissed the complaint, finding that a preponderance of the evidence indicated that Mercier's protected activity was not a contributing factor in the incident. Mercier appealed this ruling and requested a hearing in front of an ALJ. UP moved for summary decision because some of the protected activity at issue in this case occurred before the latest (August 3, 2007) amendments to the FRSA,[1] and thus UP argued that Mercier was barred from pursuing both the FRSA complaint and the CBA labor arbitration, and due to lack of jurisdiction. The ALJ denied this motion, finding that since termination occurred after August 3, 2007, there was jurisdiction over the action, and because of the amendments, Mercier was not required to elect between remedies. Further, because of FRSA's 180-day statute of limitations, 49 U.S.C. § 20109(d)(2)(A)(ii), Mercier could only challenge his termination (and not any of the

---

[1]In 2007, Congress amended the FRSA to include additional categories of protected conduct; changed the election-of-remedies language to state that an employee cannot seek protection under both the whistleblower section and another section for the same discriminatory conduct; and also as relevant here, specified that nothing in the FRSA preempts or diminishes the rights of employees and that the rights provided by the FRSA cannot be waived. 49 U.S.C. § 20109. Thus, § 20109 permitted Mercier to pursue his whistleblower claim concurrently with the CBA grievance.

earlier discipline) because he filed his petition in March 2008. The 180-day period extended back only to September 2007. However, the ALJ specifically found that while most of the protected acts of safety violation reporting occurred prior to the 180-day time frame, these acts of safety reporting were relevant and admissible because the acts provided a complete picture of the relationship between UP and Mercier and whether Mercier was discriminated against due to his protected activity.

The ALJ conducted a three-day trial on the merits of Mercier's retaliation claim, and thereafter issued a 28-page decision finding that Mercier failed to prove that his protected activities were a contributing factor in his termination. Mercier sought review before the ARB, which affirmed the ALJ's decision. Mercier appeals, arguing that the ALJ wrongly excluded evidence outside of the 180-day statute of limitations, admitted hearsay evidence, and erroneously applied the contributing-factor test.

## II.    DISCUSSION

Our review of the ARB decision is governed by the Administrative Procedure Act (APA). See 5 U.S.C. § 706(2) (APA standard of review); 49 U.S.C. § 20109(d)(4) (FRSA provision linking judicial review to the APA standards). Under this deferential standard, we must affirm the ARB's decision unless it is unsupported by substantial evidence or is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." Maverick Transp., LLC v. U.S. Dep't of Labor, 739 F.3d 1149, 1153 (8th Cir. 2014). We cannot substitute our judgment for the agency's and in considering the entire record, must affirm if substantial evidence supports the decision. Id. "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision." Gonzalez v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006). In reviewing the record, we consider evidence that both supports and detracts from the ALJ's decision, but will uphold the decision "if it is supported by substantial evidence on the record as a whole even if

more than one conclusion could be drawn from the evidence." Id. We give "great deference" to the ALJ's credibility determinations, and review an ALJ's evidentiary rulings under an abuse-of-discretion standard. Wright Elec., Inc. v. NLRB, 200 F.3d 1162, 1166, 1168 (8th Cir. 2000).

The FRSA protects railroad employees from discharge or other discrimination in retaliation for, in relevant part, reporting hazardous safety conditions or refusing to work when confronted by a hazardous safety condition. See 49 U.S.C. 20109(b)(1); Kuduk v. BNSF Ry. Co., 768 F.3d 786, 787 (8th Cir. 2014). Under the FRSA whistleblower rubric, a plaintiff must demonstrate, by a preponderance of the evidence, that (1) he engaged in a protected activity; (2) the railroad employer knew or suspected that he engaged in a protected activity; (3) he suffered an adverse action; and (4) the protected activity was a contributing factor in the adverse action. See 29 C.F.R. 1982.104(e)(2); Kuduk, 768 F.3d at 789. A contributing factor is one which, alone or in combination with other factors, has affected the outcome of the employer's decision. Kuduk, 768 F.3d at 791. If the plaintiff makes this showing, the burden shifts to the employer to show by clear and convincing evidence that it would have taken the same adverse action absent the protected activity. Id. at 789. The ALJ found that Mercier did not make a prima facie case in the first instance, and therefore did not shift the burden to UP to show by clear and convincing evidence that it would have terminated Mercier's employment absent the protected activity.

## A.    Statute of Limitations

The FRSA provides that actions "shall be commenced not later than 180 days after the date on which the alleged violation" occurred. 49 U.S.C. § 20109(d)(2)(A)(ii). Because Mercier filed his complaint with OSHA on March 27, 2008, the ALJ correctly found that any adverse employment action that occurred prior to September 29, 2007, would not be actionable due to the operation of the statute of limitations. It is beyond dispute that the adverse employment action complained of

here, Mercier's termination in November 2007, occurred after the operative cutoff date. On the other hand, Mercier's initial suspension in July 2007 falls outside of the reach of the statute and is not independently actionable. The ALJ nonetheless noted that Mercier's protected activity leading up to the July 2007 suspension, which ultimately led to his termination, was certainly relevant because it "provides a complete picture of the relationship between [Mercier] and [UP] and whether [Mercier] was discriminated against because of his protected activity." The ALJ thus correctly applied the background evidence rule enunciated by the Supreme Court in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (holding that employee can use prior acts as background evidence for a timely claim even when those same acts are time-barred).

Undeterred, Mercier vehemently contends that the ALJ failed to consider evidence that occurred prior to September 29, 2007. Despite Mercier's repeated arguments to the contrary, we find that the ALJ correctly applied the principles of Morgan by considering all of the relevant actions that occurred prior to, and after, September 2007 in evaluating this case. In the prehearing order addressing the admissibility of time-barred acts, the ALJ appropriately held that even though untimely instances of alleged retaliatory conduct were not *actionable*, they were nonetheless relevant. Indeed, the ALJ findings tell the entire story of what happened in this case; almost all of the facts detailed in the ALJ's order occurred before September 2007. Only after the ALJ thoroughly discussed Mercier's extensive safety reporting history, and the history surrounding Mericier's first interaction with Symons, the text messages to Thomas, and the July suspension and reinstatement, did the ALJ discuss post-September 29, 2007, conduct and the only cognizable employment action–Mercier's firing in November 2007. Thus, we find that the ALJ appropriately and adequately considered all of the relevant evidence in this case, regardless of when it occurred.

## B.    Hearsay Evidence

Mercier next argues that the ALJ improperly relied upon hearsay testimony, referring primarily to Symons's and Schop's testimony that a coworker related that Mercier continued to speak ill of Symons and Thomas even while subject to the waiver agreement.  Over Mercier's objection, the ALJ found that Symons's and Schop's testimony was not offered for the truth of the matter asserted, but for the effect the information had on Schop's decision to terminate Mercier.  Mercier complains that Symons and Schop related double hearsay that was contradicted by direct evidence, because the coworker Symons referred to also testified at the hearing in front of the ALJ.  At the outset, we disagree with Mercier's characterization that the alleged hearsay evidence was contradicted by the coworker's direct evidence. This coworker testified that while training, he rode with Mercier and heard about the original June-July EEO incident.  A time later, he rode with Symons and again heard about the EEO incident.  His recollection of either conversation can be described as sketchy at best, and his testimony covers eight pages in a transcript that filled nearly 600.  Further, any statement Mercier initially made to the coworker is not hearsay because it is an admission by a party opponent.[2]  29 C.F.R. § 18.801(d)(2)(i).

Nonetheless, the primary reason we reject this particular argument is because Schop's and Symons's testimony about what the coworker said was not offered to prove the truth of the matters asserted, but instead, to show the effect of the coworker's assertions on Schop.  See Simpson v. Beaver Dam Cmty. Hosps., Inc., 780 F.3d 784, 796 (7th Cir. 2015) (holding that a negative reference from an anonymous staff member was not considered for its truth in employment discrimination case, but instead was offered for its effect on the employment decision-makers).  As we will

---

[2]While the federal Rules of Evidence do not apply in administrative hearings, administrative regulations promulgated by the Secretary of Labor set forth regulations on the admission of hearsay evidence similar to those in the federal rules.  See 29 C.F.R. §§ 18.801-18.806.

discuss below, this incident was part of a culmination of incidents which induced Schop to believe, rightly or wrongly, that Mercier had violated the waiver agreement. Schop testified that the coworker originally confirmed Symons's version of the events, and this confirmation, in addition to other factors, led Schop to believe that Mercier had violated the waiver agreement and needed to be fired. The fact that the coworker testified at the hearing and did not tell the same story does not diminish the significance of Schop hearing about the incident in October 2007. Accordingly, we reject Mercier's argument that hearsay evidence at the hearing undermines the ALJ's ultimate conclusions.

## C. Contributing Factor

Mercier next argues that the ALJ misapplied the contributing-factor test, arguing that the ALJ required him to prove that the termination would not have occurred absent the safety reporting. In making this argument, Mercier points to the following statement in the ALJ's decision: "[Mercier] argues this termination was pretextual, that is, he was fired because of his protected activity not because he violated [UP's] EEO policy." But this quote is not the ALJ's statement of the legal standard; it is the ALJ's summary of Mercier's arguments. Instead, in the "Governing Law" section of the decision, the ALJ correctly notes that retaliation must be "a" contributing factor, and again in coming to its conclusion, the ALJ found that Mercier did not show retaliation was "a" contributing factor.

Nor does the ALJ's analysis otherwise indicate that it held Mercier to the wrong standard of causation. In making the contributing-factor argument, Mercier again resorts to the argument that the ALJ wrongly refused to consider actions outside of the statute of limitations time frame. As noted above, we reject Mercier's arguments in this regard. Further, substantial evidence in the record supports the ALJ's determination that Mercier could not make out a prima facie case because he did not show that his protected activities were a contributing factor in his termination. In

deciding this, we pay particular attention to the procedural posture of this case, on review of a final decision of the ARB, reviewing for substantial evidence the ALJ's decision after a three-day hearing.[3]

The ALJ relied heavily upon Schop's testimony regarding Symons's increasingly distressed communications with the EEO department in October, following Mercier's return to work in August. Schop testified that her concern over Symons's communications, coupled with the reports about Mercier's comments to the coworker about Symons's accusations, *and* the underwear comments, convinced her that Mercier had violated the waiver agreement and that she needed to terminate him based upon that violation. As earlier noted, Schop was concerned about a corresponding lawsuit from Symons. The ALJ repeatedly cited Schop's testimony about her reasons for terminating Mercier, which amounted to a credibility finding which we give "great deference." Wright, 200 F.3d at 1166.

The fact that Mercier was eventually cleared by the CBA arbitration process and has returned to work at UP has no bearing on whether the November 2007 termination was in retaliation for reporting safety violations. See Kuduk, 768 F.3d at 792 (concluding, at the summary judgment stage, that "[i]n the absence of evidence connecting his protected activity to the discharge, Kuduk is not entitled to FRSA anti-retaliation relief even if BNSF inaccurately concluded that he committed" a safety violation). Rather, the issue is whether substantial evidence supports the ALJ's conclusion that Schop terminated Mercier based upon her conclusion, accurate or not, that he violated the waiver agreement and that his safety reporting was not a contributing factor in that decision. Substantial evidence supports the ALJ's conclusion that Schop did indeed determine that Mercier's conduct violated the

---

[3]Indeed, the ALJ denied UP's motion for summary affirmance, instead finding there were material facts needing to be resolved regarding whether Mercier's protected activity was a contributing factor in his termination.

waiver agreement without considering any safety reporting issues. Mercier's arguments in favor of retaliation focus on an alleged pattern of retaliatory conduct meant to get rid of him as an employee. This assertion is belied, however, by the deal that was struck shortly after the June 2007 suspension wherein Mercier was allowed to return to work without the EEO hearing. The ALJ made a finding in this regard, stating that the superintendent's "willingness to reinstate" Mercier just a few months earlier was "inconsistent with [Mercier's] argument that [UP] was using the EEO policy as a pretext to get rid of him." We find that the ALJ's determination that Mercier's protected acts were not "a" contributing factor in his termination is, indeed, supported by substantial evidence.

In addition, although the ALJ did not make a specific finding in this regard, Mercier likely also could not meet the second prong of the prima facie case–the knowledge prong. Schop testified that she did not know about Mercier's safety reporting, and she made the decision to terminate without the superintendent's input. The superintendent likewise testified that it was the EEO department that made the decision to fire Mercier. The safety department's knowledge is not imputed to the EEO department; there must be some evidence connecting the two. See id. at 791-92 (noting that the incident which got the employee fired "was completely unrelated to" his FRSA reporting). Here there was no such connecting evidence, and indeed, the ALJ did make a finding that it was Schop's, and not the superintendent's, decision to terminate Mercier. Substantial evidence supports this finding, and thus, Mercier also cannot establish that the decision-maker for his termination had the requisite knowledge of his safety reporting. See id. at 790-91 (holding that an FRSA violation was an intentional tort requiring discriminatory animus, and cannot be committed unwittingly).

## III.    CONCLUSION

We deny the petition for review and affirm the ARB's final decision and order.

_____