# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-3292

_____

United States of America

*Plaintiff - Appellee*

v.

Max Julian Wright

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Cedar Rapids

_____

Submitted: June 8, 2017
Filed: August 8, 2017

_____

Before WOLLMAN, GRUENDER, and SHEPHERD, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Following a jury trial, Max Julian Wright was convicted of one count of conspiracy to distribute heroin, cocaine base, and fentanyl, and two counts of distributing fentanyl. Because Wright had prior felony drug convictions and the drugs caused deaths and serious bodily injuries, he was sentenced to life

imprisonment.  Wright now appeals his conviction, arguing that the district court[1] erred by admitting into evidence one of his prior felony drug convictions, limiting his cross-examination of a witness, and denying his motion for a new trial based on suppression of *Brady* material.  For the following reasons, we affirm.

## I. BACKGROUND

In December 2015, a grand jury returned a third superseding indictment charging Wright with one count of conspiracy to distribute heroin, cocaine base, and fentanyl, resulting in death and serious bodily injury, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(B), (b)(1)(C), and 846.  The indictment specified that Wright conspired to distribute 100 grams or more of heroin, 280 grams or more of cocaine base, and a mixture or substance containing a detectable amount of fentanyl. The indictment further specified that the drugs distributed in furtherance of the conspiracy caused six serious bodily injuries and two deaths.  It also charged Wright with two counts of distributing fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  Wright pleaded not guilty to all counts and proceeded to trial.

Prior to trial, the Government filed a motion in limine requesting a pretrial ruling regarding the admissibility of Wright's three prior felony drug convictions. The Government argued that the prior convictions were admissible under Federal Rule of Evidence 404(b) as evidence of Wright's knowledge, intent, and lack of mistake.  The district court granted the motion in part, excluding two of the convictions but ruling that his 2008 conviction for manufacture or delivery of greater than 40 grams of cocaine was admissible under Rule 404(b).  The court also issued a written limiting instruction, instructing the jury that the evidence regarding the prior

_____

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa.

conviction could be considered only on the issues of "intent, knowledge, and absence of mistake or accident."

Also prior to trial, the Government filed an information, pursuant to 21 U.S.C. § 851, announcing the Government's intent to pursue enhanced penalties based on Wright's prior felony drug convictions. As a result, Wright would receive a mandatory term of life imprisonment if he were convicted of the conspiracy count with a finding that the drugs distributed in furtherance of the conspiracy caused any death or serious bodily injury. *See* 21 U.S.C. §§ 841(b)(1)(B), (b)(1)(C), and 846.

At trial, the Government presented the testimony of Wright's alleged co-conspirator, DeShaun Anderson. Anderson testified that he and Wright conspired to distribute heroin and cocaine in Cedar Rapids, Iowa and that he sold drugs only at Wright's direction. In contrast, Wright's counsel sought to persuade the jury that Anderson was lying about Wright's degree of control over him and that he sold drugs independently rather than as part of a conspiracy with Wright.

Like Wright, Anderson also had a prior felony drug conviction and was charged with a conspiracy resulting in death and serious bodily injury. He agreed to plead guilty to the conspiracy charge and to testify against Wright in exchange for the Government declining to file a § 851 information, which would have resulted in a mandatory life sentence if he were convicted. During cross-examination, Wright's counsel attempted to show that Anderson was biased against Wright because he would have faced life in prison if he did not testify against Wright. Wright's counsel asked Anderson whether he was charged with "conspiracy to distribute that led to overdoses and deaths" and whether he had a "prior drug dealing conviction," and Anderson responded affirmatively. Wright's counsel then began to ask Anderson whether he knew that, because he was charged with "conspiracy with overdoses and deaths" and had "a prior drug dealing conviction," his only possible sentence would

-3-

be life imprisonment. However, before Wright's counsel could say "life imprisonment," the Government objected, and the district court held a sidebar.

The district court explained to Wright's counsel that because the conspiracy charge was the same charge that Wright faced and because the Government would be introducing evidence that Wright also had a prior drug dealing conviction, he was effectively "telling the jury what the penalty is going to be if [Wright] is convicted." Thus, the court sustained the objection and prohibited Wright's counsel from specifying that Anderson faced life imprisonment, but it solicited suggestions on what Wright's counsel could say instead of "life imprisonment" to convey the severity of the penalty that Anderson would have faced if he did not cooperate. Wright's counsel proposed asking Anderson whether he would have been "facing a mandatory minimum penalty that could cost him decades of his life." The court approved this language, and Wright's counsel proceeded to cross-examine Anderson, who agreed that he "couldn't avoid that minimum sentence that would be decades of [his] life in any way other than cooperating with the government." After Wright's trial, Anderson was sentenced to 20 years' imprisonment instead of life, as the Government declined to file a § 851 information in his case.

During the trial, the Government also presented the testimony of thirteen customers of Wright and Anderson, most of whom testified that they saw the two men selling drugs together or that Anderson would deliver drugs after they had contacted Wright. They also testified about the injuries and deaths caused by the drugs distributed by Wright and Anderson.

On March 1, 2016, the parties gave closing arguments and the case was submitted to the jury. The next day, the jury returned a verdict of guilty on all counts. However, following closing arguments, the Government learned for the first time that one of its customer-witnesses, Bonnie Schliemann, had previously cooperated with law enforcement as a confidential informant. The Government then contacted

officers at the Cedar Rapids Police Department and learned that two other customer-witnesses, Amy Kiefer and Jason Gavin, also had previously cooperated with law enforcement. Finally, the Government learned that its case agent, Gregg Fox, paid $20 to another customer-witness, Glenden Belsha, for an unsuccessful attempt to purchase drugs from Wright. Upon discovering these facts, the Government disclosed this information on March 3, 2016.

Wright filed a motion for a new trial, arguing that the Government's failure to disclose this information earlier violated his right to a fair trial under *Brady v. Maryland*, 373 U.S. 83 (1963). He also argued that the district court erred in admitting evidence of his prior felony conviction under Rule 404(b) and violated the Sixth Amendment's Confrontation Clause by limiting his cross-examination of Anderson. The district court denied the motion. It reasoned that although the information regarding the four witnesses was favorable to Wright and suppressed by the Government, it did not violate his right to a fair trial because it was not material to the outcome. It also held that it did not err in admitting the prior felony conviction and that it did not violate the Confrontation Clause. Wright now appeals.

## II. DISCUSSION

### A. Rule 404(b) Evidence

First, Wright argues that the district court erred in admitting evidence of his felony conviction under Rule 404(b). We review a district court's decision to admit prior convictions under Rule 404(b) for an abuse of discretion. *United States v. Gant*, 721 F.3d 505, 509 (8th Cir. 2013).

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "For evidence of prior bad acts to be admissible, the evidence must be: (1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged." *United States v. Young*, 753 F.3d 757, 768 (8th Cir. 2014) (citation and alteration omitted). Thus, "[t]he threshold inquiry is whether that evidence is probative of a material issue other than character." *Id.* (citation and alteration omitted). "Before we reverse, we must conclude that the evidence clearly had no bearing on any issue involved." *Id.* (quotation and alteration omitted).

Wright argues that evidence of his prior conviction for manufacture or delivery of cocaine was not relevant to a material issue because he contested only the count alleging that he conspired with Anderson, whereas he did not contest guilt on the two counts alleging that he distributed fentanyl. He states that he "conceded that he knew drugs were being sold" such that "[t]he admission of the prior conviction was not necessary to rebut any claim that Wright did not know how to sell drugs or was not inclined to." Thus, he contends that the conviction had only "marginal relevance," which was outweighed by the danger of unfair prejudice.

However, as the Government points out, Wright did contest his guilt. He pleaded not guilty to all counts. Wright did not concede that he sold drugs until closing arguments when his defense counsel stated, "Max Wright admits that he is guilty of Count 2, guilty of Count 3. We have done nothing to fight those charges." Yet the Government was not required to wait and see whether Wright would contest or concede certain charges or elements before seeking to admit related evidence. *See United States v. Gilmore*, 730 F.2d 550, 554 (8th Cir. 1984) ("The government is not required to wait until the defendant posits a particular defense asserting a lack of one of the elements of the charged crime, but may prove up their case in anticipation of

-6-

such a defense."). In fact, "[e]ven if [Wright] had gone so far as to stipulate to the requisite knowledge and intent, the Supreme Court's decision in *Old Chief v. United States*, 519 U.S. 172 (1997), eliminates the possibility that a defendant can escape the introduction of past crimes under Rule 404(b) by stipulating to the element of the crime at issue." *See United States v. Trogdon*, 575 F.3d 762, 766 (8th Cir. 2009) (citation and quotations omitted).

In any event, "[b]y pleading not guilty, [Wright] put the government to its proof on all elements of the charged crime[s]." *See Gilmore*, 730 F.2d at 554. "In a drug-conspiracy case, intent and knowledge will always be at issue because they are elements of the charged offense." *United States v. Turner*, 781 F.3d 374, 390 (8th Cir. 2015). Hence, "[i]t is settled in this circuit that a prior conviction for distributing drugs . . . [is] relevant under Rule 404(b) to show knowledge and intent to commit a current charge of conspiracy to distribute drugs." *United States v. Robinson*, 639 F.3d 489, 494 (8th Cir. 2011). Moreover, unlike in *United States v. Turner*, where "the government never explained *what* intent or knowledge the prior convictions purportedly showed or how this evidence was relevant to a particular offense charged," 781 F.3d at 390, here, the Government explained and the district court agreed that this evidence tended to show that Wright had the "motive to commit these types of offenses, that he ha[d] the knowledge to do so, and that he was not mistaken in his handling of controlled substances." Thus, Wright's prior conviction was admissible for this limited purpose.

Furthermore, the court provided the jury with a limiting instruction, and we have recognized that "the presence of a limiting instruction diminishes the danger of any unfair prejudice from the admission of other acts." *United States v. Green-Bowman*, 816 F.3d 958, 964 (8th Cir. 2016) (citation omitted). In fact, the court declined to admit evidence of Wright's other convictions specifically because it found that "[a]dmitting evidence of multiple prior convictions . . . would be cumulative on the legitimate issues of intent, knowledge and lack of mistake while almost-certainly

-7-

giving rise to the improper, prejudicial conclusion that Wright has a propensity to commit drug-distribution offenses." Therefore, we cannot conclude that the district court abused its discretion in admitting the evidence of Wright's prior drug-dealing conviction.

## B. Confrontation Clause

Wright next argues that the district court violated the Confrontation Clause by prohibiting him from cross-examining Anderson about his potential life sentence. "We review a trial court's limitation of cross-examination only for abuse of discretion; we will reverse only if there has been a clear abuse of discretion and a showing of prejudice to the defendant." *United States v. Beck*, 557 F.3d 619, 620 (8th Cir. 2009) (quotations omitted). "If the record establishes a violation of the rights secured by the Confrontation Clause of the Sixth Amendment, we must determine whether the error was harmless in the context of the trial as a whole." *United States v. Caldwell*, 88 F.3d 522, 524 (8th Cir. 1996).

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The primary purpose of this right is to guarantee the opportunity for effective cross-examination, particularly with respect to a witness's potential bias." *United States v. Brown*, 788 F.3d 830, 833 (8th Cir. 2015) (quotation omitted). "A criminal defendant's rights under the Confrontation Clause, however, are not without limit." *Id.* Rather, district courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Id.* (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). "A limitation on cross-examination does not violate the Sixth Amendment unless the defendant shows that a reasonable jury might have received

a significantly different impression of the witness's credibility had defense counsel been permitted to pursue his proposed line of cross-examination." *United States v. Dunn*, 723 F.3d 919, 934 (8th Cir. 2013) (quotation omitted).

Here, the district court limited cross-examination pertaining to Anderson's potential life sentence because it was concerned that the jury would realize that Wright also faced a life sentence if convicted. This concern was well-founded, as Wright's counsel explained to the jury why Anderson would have faced a life sentence: he had a prior felony drug-dealing conviction and was charged with conspiracy—the same situation that Wright faced. We have previously held that "[t]o inform a federal jury about a defendant's punishment would only introduce improper and confusing considerations before it." *United States v. Thomas*, 895 F.2d 1198, 1200 (8th Cir. 1990). On the other hand, we have held that "the accused should [be] able to contrast the original punishment faced by the witness with the more lenient punishment contemplated by the plea agreement." *Yang v. Roy*, 743 F.3d 622, 627 (8th Cir. 2014) (quotation omitted). In its order denying Wright's motion for a new trial, the district court recognized the tension between these two points of law, but it reiterated its belief that it "appropriately balanced the competing interests" by allowing defense counsel to ask Anderson whether he faced a mandatory minimum sentence of "decades" in prison.

Nevertheless, Wright argues that the district court abused its discretion because "a mandatory life sentence is completely unique and cannot be accurately described in any other terms." Thus, he contends that "[t]he district court's limitation on [his] right [to] cross-examination did not allow him to fully and accurately contrast Anderson's potential sentence with the benefit he stood to receive." As support, Wright points to the Ninth Circuit's decision in *United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) (en banc).

In *Larson*, the Ninth Circuit held that the district court violated the defendants' "Sixth Amendment constitutional right to effective cross-examination when it prevented defense counsel from exploring the mandatory life sentence that [a witness] faced in the absence of a motion by the Government." *Id.* at 1107. Although the district court did not justify its decision on the basis that the jury may have inferred that the defendant faced the same sentence, the Ninth Circuit raised this issue and nonetheless reasoned that "while the Government has an interest in preventing a jury from inferring a defendant's potential sentence, any such interest is outweighed by a defendant's right to explore the bias of a cooperating witness who is facing a mandatory life sentence." *Id.* at 1104-05. Hence, it concluded that "*any* reduction from a mandatory life sentence is of such a significant magnitude that excluding this information denie[s] the jury important information necessary to evaluate [the witness's] credibility." *Id.* at 1107. Thus, the Ninth Circuit seems to have adopted a *per se* rule that prohibits district courts from ever limiting cross-examination regarding the fact that a witness faces a potential mandatory life sentence.

We, however, have never adopted such an approach. To be sure, we have previously reversed district court decisions limiting cross-examinations regarding potential sentences. But none of our cases mandate that district courts always allow unfettered questioning about potential life sentences faced by cooperating witnesses.

For example, in *United States v. Roan Eagle*, we held that the district court erred in prohibiting cross-examination about the fact that the witness "pleaded guilty to voluntary manslaughter which she had to know carried a maximum sentence of ten years in contrast to a potential lifetime sentence." 867 F.2d 436, 442-43 (8th Cir. 1989). We also opined that this prohibition was not justified by the "probable certainty" that the jury would realize that the witness would receive a ten-year sentence while the defendant, who was equally guilty, "faced the specter of a Judge-imposed sentence up to life." *Id.* at 443. However, we also emphasized the fact that the district court made this decision in a pre-trial ruling—not "in the heat of

the trial or under circumstances leaving little opportunity for reflection." *Id.* Here, in contrast, the district court limited the cross-examination only after it became clear that the jury would realize what sentence Wright faced if defense counsel completed his next question. Indeed, the district court later noted, "Frankly, as I listened to counsel's questioning it was obvious to me that he was attempting to signal to the jury that Wright would receive a life sentence if convicted." Moreover, the district court in *Roan Eagle* did not offer the defendant the opportunity to phrase the question differently so as to convey the severity of the potential sentence without specifying the exact length of time, as the district court did here. *See id.*

Likewise, in *United States v. Caldwell*, we held that the district court abused its discretion in limiting cross-examination where it prohibited any reference conveying the severity of the ten-year mandatory minimum sentence that the cooperating witness would have faced. *See* 88 F.3d at 525. Instead, it allowed only a vague suggestion that the dropped charge may have called for "time in the penitentiary." *Id.* We also noted the absence of any other concerns such as confusion of the issues motivating the district court's decision. *Id.* Thus, neither *Roan Eagle* nor *Caldwell* compel the conclusion that the district court abused its discretion by limiting cross-examination in the manner it did.

In fact, we upheld a similar limitation in *United States v. Walley*, 567 F.3d 354, 360 (8th Cir. 2009). There, the district court prohibited defense counsel from questioning a cooperating witness about his potential five-year mandatory minimum sentence, but it permitted defense counsel to ask the witness whether he faced "the possibility of a *significant sentence* in this case." *Id.* at 359. We held that the district court did not abuse its discretion because "[w]e [were] not persuaded that evidence of [the witness] facing a 'five-year sentence' rather than a 'significant sentence' would have given the jury a 'significantly different impression' of [the witness's] credibility." *Id.* at 360 (quoting *Van Arsdall*, 475 U.S. at 680).

As in *Walley*, we are not persuaded that evidence that Anderson faced a life sentence would have given the jury a significantly different impression of Anderson's credibility when compared with the alternative phrase "decades" that the district court authorized at Wright's counsel's own suggestion. Notably, Anderson informed the jury that he was forty-four years old. Thus, the jury could have inferred that any prison sentence consisting of "decades" would have been nearly a life sentence. *See Larson*, 495 F.3d at 1110 (Graber, J., concurring in part) ("The jury knew [the witness's] age, 31, so any lengthy sentence . . . would have been very bad for him. Depriving the jury of the slight marginal utility of knowing about the mandatory life term (in the absence of his cooperation) simply does not equate to a constitutional violation."). Moreover, because the jury also did not know what sentence Anderson actually would receive after cooperating, the jury was free to infer that Anderson would receive a minimal sentence—possibly even saving him nearly all of the "decades" in prison alluded to. In reality, Anderson may have saved even less prison time by cooperating than what the jury believed. Anderson avoided a life sentence only to be sentenced to 20 years in prison at age forty-four. As a result, unless Anderson lives beyond age eighty-four, Anderson indeed will have saved only two "decades" or less in prison by cooperating. Thus, Wright has failed to "show[] that a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue his proposed line of cross-examination." *See Dunn*, 723 F.3d at 934 (quotation omitted).

As such, we cannot conclude that the district court abused its discretion by requiring this alternative language once Wright's counsel's line of questioning guaranteed that the jury would realize that Wright faced the same life sentence as Anderson. Therefore, the district court did not violate the Confrontation Clause.

## C. *Brady* Claim

Next, Wright argues that he is entitled to a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963). "Under *Brady* and its progeny, prosecutors have a duty to disclose to the defense all material evidence favorable to the accused, including impeachment and exculpatory evidence." *United States v. Robinson*, 809 F.3d 991, 996 (8th Cir. 2016). "This duty extends not only to evidence of which a prosecutor is aware, but also to material favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* (quotation omitted). We review a district court's denial of a new trial based on undisclosed *Brady* material for abuse of discretion. *United States v. Ellefsen*, 655 F.3d 769, 777 (8th Cir. 2011).

To prove a *Brady* violation, "the defendant must show that the evidence was favorable and material and that the government suppressed the evidence." *Id.* at 778. Here, the Government concedes that the evidence was favorable and suppressed. Thus, the only contested issue is whether the evidence was material. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quotation and alteration omitted). "When determining whether impeachment evidence . . . is material under *Brady*, the undisclosed impeachment evidence cannot be viewed in isolation. Rather, [it] must be viewed in context, alongside the witness's testimony, in light of any other impeachment evidence, and in light of corroborating evidence that bears on the witness's credibility." *Pederson v. Fabian*, 491 F.3d 816, 826 (8th Cir. 2007).

Here, the undisclosed impeachment evidence related to four customer-witnesses: Jason Gavin, Bonnie Schliemann, Amy Kiefer, and Glenden Belsha. The district court concluded that even if the Government had disclosed the evidence, the result in this case would have been the same for two reasons: "(1) the information would not have significantly changed the jury's impression of the witnesses and (2)

-13-

the weight of the other evidence would have resulted in a guilty verdict even absent the testimony of these four witnesses." We see no error in the district court's analysis.

First, the information would not have "materially affected the jury's interpretation" of any of the witnesses' testimony. *See United States v. Beckman*, 787 F.3d 466, 492 (8th Cir. 2015) (finding suppressed information immaterial where a witness's "admitted role in the scheme seriously affected his credibility from the beginning, and it is unclear how the revelation of another purported act of deception would have materially affected the jury's interpretation of [his] testimony"). To begin with, it would not have changed the jury's interpretation of Gavin's testimony. Gavin testified that he and a friend overdosed on heroin that he purchased from another witness, Marcus Wallace. He further testified that police officers found him unconscious after the overdose and that he later cooperated with one of these officers by participating in a controlled buy from Wallace. Wallace later admitted that he sold the heroin that caused the overdoses and that he had purchased this heroin from Anderson.

The impeachment evidence revealed that Gavin previously cooperated with law enforcement in 2012 by participating in a controlled buy in exchange for consideration at sentencing for drug charges he was facing. Specifically, he cooperated with Cedar Rapids Police Officer Randy Jernigan, the same officer with whom he cooperated after his overdose in this case.[2] Wright contends that this

---

[2]At the time the district court ruled on Wright's motion for a new trial, the record suggested that none of this information was disclosed to the defense before trial. However, prior to oral argument in this appeal, the Government discovered that Gavin admitted in his grand jury testimony that he participated in a controlled buy two or three years earlier "in an attempt to work off a charge." The Government has filed a motion to supplement the record with this information, which we grant. A transcript of this testimony had been disclosed to Wright before trial. However, this

information "would have provided a basis for compelling cross-examination" on the issue of "the degree of his motivation to curry favor with the government."

However, even if this information could have been used to show that Gavin had a motivation to curry favor with the Government, Wright fails to explain how this would have benefitted him. Gavin did not implicate Wright in his testimony. He was not one of Wright's customers. In fact, he testified that he did not know where Wallace obtained his heroin and that he had never seen Wright before. Gavin simply testified that Wallace provided him with the heroin that he and his friend used to overdose. The fact that he overdosed was corroborated by law enforcement. And Wallace admitted that he sold the heroin to Gavin. Thus, the district court did not abuse its discretion in finding that Gavin's previous cooperation with Officer Jernigan would be of little value in changing the jury's interpretation of his testimony.

Schliemann's testimony regarding Wright and Anderson was likewise corroborated by other evidence. She testified that she would often call or text Wright to purchase heroin, and Anderson would show up to sell it to her. Text messages downloaded from Anderson's phone showed that Wright and Anderson repeatedly referred to "Bon," whom Anderson identified as Schliemann. Moreover, Wright's counsel already impeached Schliemann regarding her drug use, numerous prior convictions, and the fact that she knew that she could face charges for purchasing heroin.

Likewise, significant independent evidence corroborated Kiefer's testimony, and other information already in the record suggested that Kiefer may have had other, stronger reasons to be biased in favor of the Government. Kiefer testified that on

---

testimony did not reveal that the officer with whom Gavin previously cooperated was Officer Jernigan, and so we still proceed under the assumption that the impeachment evidence related to Gavin contained favorable material that was suppressed.

-15-

May 18, 2015, she purchased heroin from Wright and used it to overdose. The Government showed that Kiefer's phone contained text messages between Kiefer and Wright related to a sale of heroin shortly before Kiefer's overdose. Anderson and Kiefer's boyfriend, Keith Ciha, largely corroborated Kiefer's testimony regarding her historical dealings with Anderson and Wright. Wright's counsel also cross-examined Kiefer about the fact that she was attempting to be as cooperative as possible with the Government because the Government also was deciding whether to bring charges against her boyfriend for purchasing heroin from Wright and providing it to another overdose victim. Thus, the district court did not abuse its discretion in finding that evidence that Schliemann and Kiefer previously cooperated with the Government in unrelated cases would not have materially affected the jury's impression of them.

Belsha testified that he purchased heroin from Anderson that he provided to another overdose victim, Amanda Marquis. He also testified that Anderson and Wright worked together to sell heroin. The impeachment evidence related to Belsha revealed that he received $20 for an unsuccessful attempt to purchase drugs from Wright. However, Wright's counsel was able to impeach Belsha regarding numerous issues. First, Belsha admitted that he wanted to avoid facing charges for Marquis's overdose. Second, Belsha admitted that he initially lied when questioned by the police in order to protect himself and his direct source for heroin and that he told the truth only after police confronted him with text messages from his phone. Third, he admitted that he had to be arrested on bench warrant because he failed to appear in court to testify. Fourth, Wright's counsel pointed out that Belsha's demeanor and appearance suggested that he was not drug-free, as he claimed. Fifth, Belsha admitted that he hated Wright for ruining his life by selling him heroin. In light of this abundant impeachment information, the district court did not abuse its discretion in concluding that evidence of the $20 payment would not have materially affected the jury's opinion of Belsha.

Even when viewing the suppressed evidence collectively, there is no reasonable likelihood that it would have resulted in a different verdict. Wright suggests that "the fact that some of these witnesses have a history of cooperating with the government and saving themselves from drug charges may well affect how jurors view the customer-witnesses generally." However, even assuming that it is possible that the jury could have concluded that every single customer-witness was lying in exchange for leniency, Wright has not shown there is a reasonable probability that the jury would have drawn such an inference from the mere fact that three of the witnesses previously cooperated with the Government in unrelated cases. *See United States v. Jones*, 160 F.3d 473, 479 (8th Cir. 1998) ("[M]ateriality is not established by the mere possibility that the withheld evidence may have influenced the jury."). As such, the district court did not err in concluding that the impeachment evidence would not have materially affected the jury's interpretation of the witnesses' testimony.

Second, even without the testimony of all four of the relevant witnesses, the weight of the other evidence was overwhelming and still would have resulted in a guilty verdict. *See United States v. Pendleton*, 832 F.3d 934, 941 (8th Cir. 2016) (finding no *Brady* violation where "the testimony of these two witnesses was not essential to proving [a defendant's] guilt because the other evidence of his guilt was overwhelming"). Most notable was the testimony of Anderson. According to Anderson, Wright regularly traveled from Cedar Rapids to Chicago and brought back heroin and cocaine. Anderson testified that he and Wright sold about 100 grams of heroin every week. He further testified that Wright would repackage the drugs for distribution, store them at Anderson's apartment, make customer contacts, and direct Anderson where to deliver the drugs. He also authenticated text messages from Wright directing him to distribute drugs. Anderson stated that he sold drugs in this manner every day from June 2013 until his arrest in April 2015, with breaks in June 2014 and October to December 2014.

In addition to Anderson, multiple customers testified about Wright's heroin operation. For example, Cameron Weber testified that he obtained $40 to $50 worth of heroin six to ten times from each of Wright and Anderson and that Anderson sometimes would show up to deliver the heroin after he had called Wright. Eight other customer-witnesses testified in the same fashion: they obtained drugs regularly from Wright and Anderson, and sometimes Anderson would show up after they had called Wright or vice-versa. The one remaining customer-witness testified that she purchased drugs only from Anderson, but she knew that Wright and Anderson worked together because they used the same vehicle. Thus, ample evidence proved the existence of a conspiracy between Wright and Anderson to distribute drugs.

Nevertheless, Wright suggests that even if the jury would have found that some conspiracy existed, the testimony of the four affected witnesses was necessary to prove that Wright was responsible for conspiring to distribute over 100 grams of heroin and to prove three of the overdoses. After excluding the testimony of the four witnesses, Wright calculates that the most heroin that the Government could prove he was responsible for was approximately 91 grams. However, as noted previously, Anderson testified that he and Wright sold about 100 grams of heroin every week for years. Moreover, several witnesses not included in Wright's calculations testified to regular drug purchases but did not provide specific numbers.

Regardless, even if the jury found that Wright was not responsible for more than 100 grams of heroin or for three of the overdoses, the outcome of the proceeding would not have been different because his sentence would remain the same. If the jury found Wright responsible for less than 100 grams of heroin, he would have been convicted under 21 U.S.C. § 841(b)(1)(C) for the conspiracy to distribute heroin—just as he was for the conspiracy to distribute cocaine and fentanyl—instead of under § 841(b)(1)(B). *See* 21 U.S.C. § 841 (b)(1)(C) (criminalizing distribution of any "controlled substance in schedule I or II" regardless of quantity); *id.* § 812 (listing heroin as a schedule I drug and cocaine and fentanyl as schedule II drugs).

-18-

Although § 841(b)(1)(C) generally provides for lesser sentences than § 841(b)(1)(B), it likewise requires a sentence of life imprisonment "[i]f any person commits such a violation after a prior conviction for a felony drug offense has become final . . . and if death or serious bodily injury results from the use of such substance." The jury found that the drugs provided by Wright and Anderson caused six serious bodily injuries and two deaths. Thus, even assuming the jury would not have held Wright responsible for three of the overdoses as he claims, he still would be responsible for five of them. As such, the result of the proceeding would not have been different: Wright still would have received a sentence of life imprisonment.

Finally, Wright suggests that the district court erroneously "applied something akin to a sufficiency of the evidence test to determine materiality." Wright bases this argument on several lines in the district court's order such as "the Government produced enough evidence for the jury to convict Wright beyond a reasonable doubt." It is true that "we may not rely solely on a sufficiency-of-evidence analysis to make a *Brady* determination." *Jones*, 160 F.3d at 479. However, elsewhere in the order, the district court made clear that it was applying the correct standard. At the beginning of its analysis, it correctly recited the "reasonable probability" standard, and it ultimately found "virtually no probability, reasonable or otherwise, that the result would have been different." *Cf. Mercier v. U.S. Dep't of Labor*, 850 F.3d 382, 390 (8th Cir. 2017) (rejecting the argument that an administrative law judge applied the wrong legal standard where it recited incorrect term in one section of opinion but elsewhere "correctly note[d] that retaliation must be 'a' contributing factor, and again in coming to its conclusion, . . . found that [the petitioner] did not show retaliation was 'a' contributing factor"). Moreover, as explained above, the district court's analysis supported this finding, as the impeachment evidence would not have materially affected the jury's interpretation of the witnesses' testimony and the evidence of Wright's guilt was overwhelming. Therefore, we find none of Wright's

arguments convincing, and we conclude that the district court did not abuse its discretion in rejecting his *Brady* claim.[3]

## III. CONCLUSION

Because the district court did not abuse its discretion by admitting Wright's prior conviction, limiting cross-examination, or denying the motion for a new trial based on *Brady* information, we affirm.

—————————————————

[3]Wright also appears to suggest that by failing to disclose the impeachment evidence, the Government violated his Sixth Amendment right to confront the witnesses against him. However, the Confrontation Clause has never been recognized as an independent method of enforcing pretrial disclosure of impeachment information. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987) (plurality opinion) (stating that the Confrontation Clause is not "a constitutionally compelled rule of pretrial discovery"). Moreover, even if a Confrontation Clause violation did occur, we would find it harmless beyond a reasonable doubt for the same reasons we concluded that the impeachment evidence was not material under *Brady*. *See Jones*, 728 F.3d at 766 (holding that harmless-error inquiry regarding cross-examination depends on "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case" (quotation omitted)). As such, we find no merit in Wright's suggestion.