# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1450

_____

United States of America

*Plaintiff - Appellee*

v.

Luke Joseph Burning Breast

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Central

_____

Submitted: December 18, 2020
Filed: August 11, 2021

_____

Before GRUENDER, ERICKSON, and KOBES, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Luke Joseph Burning Breast appeals his conviction for being a felon in possession of a firearm, arguing the government failed to show he (1) possessed a "firearm" that traveled in interstate commerce, and (2) knew of his status as a

prohibited person. Burning Breast also argues the district court[1] failed to properly instruct the jury on both issues. We affirm.

## I.    BACKGROUND

In 2007, Burning Breast pled guilty in federal court to being a drug user in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). He received a three-year probationary sentence. Twelve years later, on July 28, 2018, Burning Breast purchased an AR-15 style rifle from his mother, Georgia Hackett ("Hackett"). Hackett, on April 9, 2019, reported a domestic incident between Burning Breast and his girlfriend that occurred at Hackett's residence in Rosebud, South Dakota. As Burning Breast was being arrested, the officers asked him where to find his car keys so Hackett could move his vehicle. Burning Breast stated the keys were outside next to his rifle. Aware of Burning Breast's prior criminal record, when one of the officers questioned Burning Breast, Burning Breast admitted he was a felon but believed his conviction had been expunged since it was more than ten years old. The officer told Burning Breast that under federal law he continued to be a felon unless he received a pardon. Burning Breast responded, "Well, that's what must have happened."

The officers seized the rifle, a loaded magazine found near the rifle, and another magazine located inside the residence. Burning Breast's rifle was distinctive, as portions had been spray-painted blue. After Burning Breast was released on the domestic assault charge, he filed a motion in tribal court to recover the rifle. He produced the bill of sale from July 2018, and the tribal court ordered the rifle be returned to Burning Breast.

---

[1]The Honorable Roberto A. Lange, United States District Judge for the District of South Dakota.

On August 14, 2019, Burning Breast was indicted for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment alleged that Burning Breast knowingly possessed a Smith & Wesson, model M&P 15 semi-automatic rifle, which had been shipped and transported in interstate and foreign commerce. Before trial, the government filed a motion *in limine* to exclude evidence regarding Burning Breast's "mistake of law" as to his status as a prohibited person and Burning Breast's possible belief that the prior conviction had been expunged. After a hearing, the district court granted the motion and, relying on Rehaif v. United States, 588 U.S. ___, 139 S. Ct. 2191 (2019), determined the government did not have to prove Burning Breast knew he was prohibited from possessing a firearm, but only that he knew he belonged to the relevant category of persons barred from possessing a firearm.

At trial, the court received into evidence a certified copy of the judgment from Burning Breast's prior felony conviction along with the plea agreement and transcript from the plea hearing. The transcript and plea agreement each outlined the maximum penalty for the offense as exceeding one year. Special Agent Brent Fair of the Bureau of Alcohol, Tobacco, Firearms and Explosives testified that the rifle found in Burning Breast's possession was an AR-15 style rifle with an upper and lower receiver, and, consistent with federal regulations, only the lower receiver was marked with a serial number. Special Agent Fair further testified that he traced the lower receiver, which was manufactured in Illinois and thereafter shipped to Massachusetts, "where it was assembled as a finished rifle by Smith & Wesson." From Massachusetts the firearm was shipped to Louisiana before being shipped to a gun dealer in Nebraska. The firearm was sold in 2014 to an individual in South Dakota. Several years later, the firearm was recovered in Burning Breast's possession. Special Agent Fair opined the firearm in Burning Breast's possession was a complete firearm manufactured by Smith & Wesson and the parts that had been subsequently painted, or swapped out, or added (the evidence before the jury was that the only known changes to the rifle

were a scope and a light[2]) did not change the fact that it was a firearm that had been shipped and transported in interstate commerce.

Burning Breast moved for judgment of acquittal, asserting the government failed to meet its burden because it did not prove the entire firearm traveled in interstate commerce, only the lower receiver. The district court denied the motion, finding the jury could infer that the fully assembled firearm crossed state lines. Burning Breast requested a theory of defense instruction, which highlighted the definition of a receiver. While the district court did not instruct the jury exactly as Burning Breast requested, it added a definition of receiver to the instructions. The district court declined to give Burning Breast's other requested instruction, which stated that Burning Breast had to know his prior conviction was not expunged. After deliberating for 46 minutes, the jury found Burning Breast guilty. The district court sentenced him to a 16-month term of imprisonment. Burning Breast timely appealed.

## II.    DISCUSSION

We review *de novo* the denial of a motion for judgment of acquittal "viewing the evidence in a light most favorable to the verdict and accepting all reasonable

---

[2]Hackett testified about the changes to the rifle as follows:
Q.    Do you know when he painted [the firearm] approximately?
A.    No. I don't. We live separately. He is a grown man.
Q.    Sure. Do you - - can you see some of the components on here that might have changed during the time that you saw him with his rifle?
A.    Well, the scope.
Q.    Okay. The sight back here?
A.    Yeah. And the - -
Q.    The light? You saw those things added?
A.    Yeah, uh-huh.
(Trial Tr. Vol. II pp. 63–64).

inferences supporting the verdict." United States v. Colton, 742 F.3d 345, 348 (8th Cir. 2014). We reverse "only if no reasonable jury could have found guilt beyond a reasonable doubt." United States v. Mabery, 686 F.3d 591, 598 (8th Cir. 2012).

In order to be convicted of being a felon in possession of a firearm, the government must prove beyond a reasonable doubt that (1) Burning Breast had been previously convicted of a crime punishable by a term of imprisonment exceeding one year; (2) Burning Breast knowingly possessed a firearm; (3) the firearm was in or affecting interstate commerce; and (4) Burning Breast "knew he belonged to the relevant category of persons barred from possessing a firearm." United States v. Coleman, 961 F.3d 1024, 1027 (8th Cir. 2020) (cleaned up); see 18 U.S.C. § 922(g). Burning Breast challenges the third and fourth elements, arguing that the evidence was insufficient to sustain a conviction under § 922(g).

With regard to the interstate nexus requirement, we have explained that "[t]he government need not produce the firearm in question to satisfy this element; proof that the firearm was manufactured outside the state of possession will suffice." United States v. Cox, 942 F.2d 1282, 1286 (8th Cir. 1991) (citation omitted). As relevant in this case, 18 U.S.C. § 921(a)(3) defines a "firearm" as "(A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon." The frame or receiver is defined by regulation as the "part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11. Burning Breast argues that, because the government did not prove the upper receiver traveled in interstate commerce, the evidence was insufficient to convict him of being a felon in possession of a firearm.

The dissent, and Burning Breast, focus exclusively on whether the lower receiver is a receiver within the regulatory definition of receiver and whether the

government had to prove the upper receiver also traveled in interstate commerce. Those issues are simply red herrings under the circumstances of this case. The dissent mistakenly asserts that if the lower receiver is not a "receiver" under the regulation, it cannot be a firearm. Consistent with 18 U.S.C. § 921(a)(3), the jury was instructed, in relevant part, that a firearm includes:

1.  Any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; or

2.  The frame or receiver of any such weapon; . . .

Special Agent Fair explained to the jury that "[t]here's more than one definition under federal law for a rifle or a firearm." A frame or receiver is simply one way to meet the definition. Another way is if the weapon will, is designed to, or may readily be converted to expel a projectile by the action of an explosive. Notwithstanding the lack of evidence establishing the upper receiver had, in fact, been swapped out, there was no evidence that at any point the firearm was anything but a weapon that could, or was designed to, or may readily be converted to expel a projectile by the action of an explosive. Here, it is immaterial whether there was proof that the upper receiver traveled in interstate commerce when the evidence established a completed rifle capable of being shot traveled in interstate commerce prior to Burning Breast's possession of it.

As the government argued during closing arguments, the uncontroverted evidence established this AR-15 style rifle was a firearm under the first part of the statutory definition because it was capable of being shot and no evidence was presented to dispute this testimony. The government could meet its burden in a manner broader than the limitation imposed by the dissent, which requires proof that the upper and lower halves of the receiver traveled in interstate commerce.

The trial transcript refutes the dissent's characterization of the government's case as relying solely on the receiver traveling in interstate commerce. The government specifically questioned Special Agent Fair as to whether the entire firearm traveled in interstate commerce:

> Q: If this firearm was taken to a dealer in Nebraska and then later recovered in South Dakota, does it meet the interstate nexus?
>
> A: Yes it does. Traveled interstate commerce.

(Trial Tr. Vol. II p. 86). During cross-examination, Burning Breast's counsel spent significant time questioning Special Agent Fair about Burning Breast's gun, and whether certain parts may have been swapped out or personalized. He also questioned Special Agent Fair about the definition of "receiver" in the ATF regulations, and whether Special Agent Fair was able to trace the upper receiver in this case. Whether the upper receiver could be traced with certainty to establish it traveled in interstate commerce was the defense theory of the case, not a theory propounded by the government or exclusively relied on to prove the charge. Special Agent Fair maintained throughout his testimony that the finished firearm traveled in interstate commerce:

> A: I will tell you that I do not know who made the upper. . . . But the lower is manufactured by LW Schneider in the State of Illinois; shipped to Massachusetts as a complete firearm manufactured in Massachusetts; shipped to Lipsey's in Baton Rouge, Louisiana; shipped to Nebraska; and found here in South Dakota.
>
> Q: That's not this firearm, is it?
>
> A: This is a firearm. And this firearm transported – was transported in interstate commerce.

(Trial Tr. Vol. II p. 107). The government reiterated its position on redirect when Special Agent Fair confirmed his opinion that the finished firearm traveled in interstate commerce.

> Q:  [I]t was your testimony that that was a complete firearm, meaning that the entire firearm was manufactured by Smith & Wesson?
>
> A:  Correct. At one point this was -- the serialized receiver frame was part of a complete firearm, sold as a firearm, manufactured in the State of Illinois and the State of Massachusetts, to be a whole and a functioning firearm.

(Trial Tr. Vol. II p. 110-11). And the Government argued during rebuttal closing argument by specifically asking the jury to find that the firearm was 'a completed rifle when it left Massachusetts.'" (Trial Tr. Vol. II p. 188).

Viewing the evidence in the light most favorable to the verdict, as we must, we conclude the evidence in the record is sufficient for the jury to find that Burning Breast's finished rifle meets the first part of the definition of firearm as set forth in § 921(a)(3). The jury apparently rejected Burning Breast's defense theories. That Burning Breast might have "personalized" the rifle by adding a scope or light, or by partially painting it blue, does not in itself negate its status as a firearm capable of being shot. Whether the finished rifle Special Agent Fair traced and testified about at trial is the firearm later found in Burning Breast's possession is a fact question for the jury to decide, not a legal question for the court. Unlike the dissent, we believe there was sufficient evidence from which the jury could draw a reasonable inference, beyond a reasonable doubt, that the finished rifle traveled in interstate commerce arriving in Burning Breast's possession unchanged.

The jury was properly instructed that the interstate commerce element of the offense is satisfied if the firearm was transported in interstate commerce "at some time during or before the defendant's possession of it." See Eighth Circuit Manual

of Model Jury Instructions (Criminal) 6.18.922B (2017). The jury could reasonably infer from the evidence that the rifle in question was at all times a fully functioning firearm that traveled in interstate commerce before Burning Breast's possession of it.

Burning Breast's challenge to the fourth element regarding his knowledge of his status as a prohibited person also fails. The court received into evidence the judgment, plea agreement, and plea transcript from Burning Breast's prior felony conviction, which established Burning Breast's status as a prohibited person. "While Rehaif makes clear that the government must prove that a defendant knew he was in the category of persons prohibited under federal law from possessing firearms, Rehaif did not alter the 'well-known maxim that 'ignorance of the law' (or a 'mistake of law') is no excuse.'" United States v. Robinson, 982 F.3d 1181, 1187 (8th Cir. 2020) (quoting Rehaif, 139 S. Ct. at 2198).

Burning Breast makes two arguments regarding his belief that his right to possess firearms had been restored. He first argues mistake of law. Burning Breast asserts that he erroneously, but genuinely, believed he no longer qualified as a prohibited person because his gun rights were restored under tribal law. See 18 U.S.C. § 921(a)(20) (stating that convicted felons are not prohibited from possessing firearms if their civil rights had been restored). But, because Burning Breast's prior conviction was under federal law, only a restoration of rights under federal law, not tribal law, qualifies. See Beecham v. United States, 511 U.S. 368, 373–74 (1994). Accordingly, Burning Breast's mistake of law argument is unavailing. See Robinson, 982 F.3d at 1187.

Second, Burning Breast claims mistake of fact, arguing he erroneously, but genuinely, believed that his conviction had been expunged or he had received a presidential pardon. See 18 U.S.C. § 921(a)(20). For support, Burning Breast points to record evidence indicating he voluntarily revealed his gun ownership to police and told police that, when he had applied to the Navy, the Navy had no record of his prior

conviction. When an officer informed Burning Breast that only a presidential pardon could excuse his prior felony conviction, Burning Breast responded "well, that must have happened." Burning Breast did not testify at trial and points to no direct evidence supporting his alleged belief. The evidence Burning Breast offered to support his alleged belief that he was not a prohibited person is insufficient for us to conclude that "no reasonable jury could have found guilt beyond a reasonable doubt." See Mabery, 686 F.3d at 598.

Finally, Burning Breast argues the jury instructions were improper on the questions of interstate nexus and his knowledge of being a prohibited person. We review the rejection of a defendant's proposed instruction for abuse of discretion, United States v. Vore, 743 F.3d 1175, 1181 (8th Cir. 2014), and we review *de novo* the district court's interpretation of the law, United States v. Farah, 899 F.3d 608, 614 (8th Cir. 2018). While a defendant is entitled to a theory of defense instruction if it is timely requested, is supported by the evidence, and is a correct statement of the law, a defendant is not entitled to particular wording if the instruction actually given by the trial court adequately and correctly covers the substance of the requested instruction. United States v. Solis, 915 F.3d 1172, 1178 (8th Cir. 2019) (cleaned up). In other words, there is no abuse of discretion if the instructions "as a whole, by adequately setting forth the law, afford counsel an opportunity to argue the defense theory and reasonably ensure that the jury appropriately considers it." United States v. Gilmore, 968 F.3d 883, 886 (8th Cir. 2020) (quoting United States v. Christy, 647 F.3d 768, 770 (8th Cir. 2011)).

The district court accurately instructed the jury on the definitions of "firearm" and "receiver." Burning Breast was able to argue to the jury his theory that the firearm did not travel in interstate commerce. We find no error or abuse of discretion as to the interstate nexus element. Likewise, the jury was properly instructed on the elements of the crime in a manner that tracked the statute and was consistent with Rehaif:

The government must prove, beyond a reasonable doubt, both that the defendant was convicted of a felony offense and that the defendant knew that he had a felony conviction at the time he allegedly possessed a firearm that had traveled in interstate or foreign commerce. That is, the government must prove beyond a reasonable doubt that the defendant knew of his status as a person previously convicted of a felony.

As to the issue of expungement or restoration of civil rights, the court instructed the jury as follows:

Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of the felon in possession of a firearm charge, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not . . . possess, or receive firearms. Therefore, it is a defense to the charge of a felon in possession of a firearm that the defendant had his civil rights substantially restored. . . . However, if a defendant's conviction was under federal law, no state or tribe has the authority to expunge, set aside, or pardon such a prior federal felony conviction.

This instruction was an accurate statement of the law and maintained Burning Breast's ability to argue that he lacked the requisite knowledge of being a prohibited person. See Gilmore, 968 F.3d at 886. Burning Breast's requested instruction would have added a fifth element to the crime, unsupported by the law. It was neither error nor abuse of discretion for the district court to decline to give Burning Breast's requested instruction on knowledge.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's judgment.

KOBES, Circuit Judge, dissenting.

Contrary to 18 U.S.C. §§ 921(a)(3) and 922(g)(1), the court does not require proof beyond a reasonable doubt that a firearm or its receiver moved across state lines. Instead, it upholds a verdict backed by little more than an ATF agent's mistaken testimony that a single gun part, an AR-15 lower receiver, is a firearm under ATF regulations. It is not. Because the Government failed to satisfy even its *own* understanding of what the law required, I think the evidence was insufficient. I respectfully dissent.

The relevant evidence in this case came from one ATF expert witness. His testimony was based on ATF records that traced one serialized part on Burning Breast's gun: the lower receiver. The records showed that the lower receiver was made in Illinois and shipped to Massachusetts, where it was assembled with other parts into a Smith & Wesson M&P 15, an AR-15-style rifle. The Massachusetts rifle with the traced lower receiver was shipped to Louisiana and sold by a dealer in Nebraska to "Arlene Paulson of Mission, South Dakota" in 2014. Trial Tr. 86. Five years later, police found the lower receiver on Burning Breast's gun.

Given these facts, there are two ways the Government could get a conviction. First, it could have proven that the lower receiver found on Burning Breast's gun is a "receiver," and so a "firearm" as a matter of law. 18 U.S.C. § 921(a)(3)(B). That was what the ATF agent repeatedly told the jury,[3] and that was the Government's

---

[3]The ATF agent's testimony in this case is problematic. The court misreads the trial transcript when it concludes that the ATF agent "maintained throughout his testimony that the finished firearm traveled in interstate commerce," Maj. Op. at 7. A deeper review of the record shows he did no such thing. The ATF agent incorrectly told the jury several times that the lower receiver alone was itself a firearm under ATF regulations. *See, e.g.*, Trial Tr. 82–83 ("So this frame or receiver [referring to the lower receiver] . . . . itself is a firearm. That firearm was shipped to

-12-

theory at trial. *See, e.g.*, Trial Tr. 188 ("[W]e're talking about the upper receiver and the lower receiver. That was a complete firearm."); *see also id.* ("Maybe it was just the lower receiver . . . . Even then, the interstate nexus requirement is met."). There is just one problem: an AR-15's lower receiver does not meet the Government's own definition of a "receiver."

To be a "receiver," ATF regulations require the part to "provide[] housing for the hammer, bolt or breechblock, and firing mechanism." 27 C.F.R. § 478.11. But only two of those are in an AR-15 lower receiver. *See* Trial Tr. 97–99. The third is in an AR-15 upper receiver, and the gun can't shoot without both receivers.[4] If the lower receiver is not a receiver under the regulation and if it cannot perform the function of a "receiver," then it is not a receiver under § 921(a)(3)(B). That means an AR-15 lower receiver is not a "firearm," and the Government's theory at trial was a non-starter.

The Government could also have proven that Burning Breast's complete rifle moved across state lines. *United States v. Shelton*, 66 F.3d 991, 992 (8th Cir. 1995)

---

Massachusetts where it was assembled as a finished rifle . . . ."). The ATF agent doubled down on his error when he told the jury again that the lower receiver "is a firearm" that "was transported in interstate commerce," Trial Tr. 107, and that complete receivers only "usually," but do not have to, house the bolt—even though housing for the bolt is listed in 27 C.F.R. § 478.11 as an element of a "receiver." Trial Tr. 108–09. And at the close of cross-examination, he repeated that the "part [that was] manufactured in the State of Illinois," *i.e.*, the lower receiver alone, "is the firearm." Trial Tr. 113. This misstated the ATF regulation and was materially misleading.

[4]The lower receiver of an AR-15-style rifle "provides housing for the hammer and the firing mechanism." *United States v. Rowold*, 429 F. Supp. 3d 469, 471 (N.D. Ohio 2019). The lower receiver does not house the rifle's bolt—which is instead housed by the upper receiver—and the rifle cannot fire without both halves of the complete receiver. *Id.*

(per curiam).[5] But the Government did not support that theory at trial.[6] It based its entire argument that the whole rifle moved interstate on a single interchangeable component—a component that is not a firearm under § 921(a)(3) because it is not a weapon. The court nonetheless concludes the Government carried its burden, saying that "[t]he jury could reasonably infer from the evidence that the rifle in question was at all times a fully functioning firearm that traveled in interstate commerce before Burning Breast's possession of it." Maj. Op. at 9.[7]

I grant that Burning Breast possessed a functional rifle. But it is not so clear that a jury could reasonably infer that it traveled in interstate commerce. In order for

[5]Other courts have adopted the reasonable rule that it is enough to prove that a gun's "principal parts" moved in interstate commerce. *United States v. Verna*, 113 F.3d 499, 503 (4th Cir. 1997).

[6]The court disagrees. It points to the Government's closing argument, where the Government asked the jury to find that Burning Breast's rifle was "a completed rifle when it left Massachusetts." Maj. Op. at 8 (quoting Trial Tr. 188). But, as I explain below, the Government introduced no evidence about the whole rifle. The Government's closing argument either advanced a last-minute position it never supported with evidence, or was based on the mistaken belief that the lower receiver was itself a complete firearm as a matter of law. Regardless, the Government's closing argument cannot whisk sufficient evidence into existence.

[7]The court overplays its hand when it casts this as a simple case where the ATF traced a "finished rifle" across state lines and that same rifle was found in the defendant's possession. Maj. Op. at 8. To be clear, the ATF did not trace a rifle. *See* Trial Tr. 108–09 (Q: "The trace doesn't tell you where any of the rest of the components of this gun [besides the lower receiver] came from, does it?" A: "No. The trace just identifies the serialized part on the firearm . . . ."). As the court itself recognizes, the only part that was serialized on Burning Breast's rifle was the lower receiver. Maj. Op. at 3. So no rifle was ever traced, and all the evidence of interstate travel concerns just one component. The only evidence about whether the whole rifle traveled anywhere is Burning Breast's mother's testimony that neither she nor her son took the gun out of South Dakota. Trial Tr. 65–66.

an inference to be reasonable, there must be some evidence to support it. But there is no evidence that anything other than the lower receiver moved in interstate commerce. The ATF agent admitted as much. Trial Tr. 108 (explaining that "there is no way to know" where any part on the gun besides the lower receiver came from). Even the Government conceded as much. Trial Tr. 188 ("There is no way to know whether that upper or lower receiver was swapped out."). The only thing tying Burning Breast's rifle to the Massachusetts rifle was the lower receiver. If this were a typical case with evidence that (1) a functional firearm that was indisputably stock from an out-of-state manufacturer; (2) a complete receiver; or (3) the principal parts of an assembled rifle traveled in interstate commerce, the evidence may have been enough. But that kind of evidence was not presented here.

In fact, the evidence here made it less likely that Burning Breast's rifle was the Massachusetts rifle. The ATF agent told the jury that AR-15 parts "are mix and match," Trial Tr. 102, and that "there is [a] hobby industry, cottage industry about making these things your own." Trial Tr. 89. Burning Breast's mother testified that because her son personalized another rifle as a teenager, he could have built this rifle himself from components he bought. While she did not know how Burning Breast got the rifle—or, critically, whether it was a complete, stock rifle at that time—she saw her son add parts to it in between the short-term loans she made when he offered the rifle to her as collateral.

The Government did not dispute that testimony, and even said that it was not "clear exactly [at] what point [Burning Breast] came into possession of that firearm." Trial Tr. 165. After examining Burning Breast's rifle again at trial, the ATF agent agreed that it was different from a stock M&P 15: many of the stock parts of an M&P 15 were either not on the gun at all or had been "swapped out."[8] Trial Tr. 111. Plus,

---

[8]The ATF agent's answer presumed that Burning Breast's rifle was the Massachusetts rifle and that Burning Breast "swapped out" the parts on it, leaving

the ATF agent remarked that the upper receiver and handguard were painted a different color than the rest of the gun—and he said that while he did not know who made either part, he could have found out who made the upper receiver.

When the ATF agent was finally asked whether Burning Breast's rifle was a different gun than the Massachusetts rifle, the agent pointed to the lower receiver in front of him and told the jury that he knew they were the same because "the frame or receiver, [the] serialized part, this is the firearm . . . . I'm talking about the frame or receiver." Trial Tr. 113. That is, the ATF agent told the jury that the only part that mattered in this case was the lower receiver because the lower receiver is itself a firearm. He was wrong. And because of that mistake, he did not trace any other part. This is not a case where someone merely "add[ed] a scope or light" to a pre-existing stock firearm. Maj. Op. at 8. This is a complete lack of evidence that anything other than one part on Burning Breast's rifle traveled in interstate commerce.

The court struggles to find anything in the record that could make the inference that Burning Breast's rifle moved across state lines reasonable. It instead approvingly quotes the ATF agent's testimony that "[t]his is a firearm," and that "this firearm transported—was transported in interstate commerce." Maj. Op. at 7 (quoting Trial Tr. 107). But the court's quote proves my point: it is clear and unambiguous from the surrounding testimony that the ATF agent was answering questions about the "lower [receiver]" and told the jury that single part was a "complete firearm" when he said "[t]his is a firearm." Trial Tr. 107; *see also* n.1, *supra*.

---

just the original lower receiver on the rifle. But the agent could not have known that the rifle in front of him was an M&P 15 from the start, let alone that it was the same M&P 15 that originally contained the lower receiver. All he knew for certain was (1) that Burning Breast's rifle had an M&P 15 lower receiver on it that crossed state lines; and (2) that Burning Breast's rifle was missing other parts that would be found on a stock M&P 15. That makes it less likely that Burning Breast's rifle was the Massachusetts rifle.

-16-

The court also points to the ATF agent's answer to a hypothetical scenario. *See* Maj. Op. at 7. It is of course true, as the ATF agent said, that if a firearm crosses over state lines, it "meet[s] the interstate nexus [requirement]." *Id.* (quoting Trial Tr. 86). But his testimony there didn't answer the critical question of whether Burning Breast's rifle was the same gun that originally contained the lower receiver and crossed state lines. The Government had to show that it was the same gun in order to prove that Burning Breast's entire gun moved in interstate commerce. But none of the Government's evidence ever drew that connection.

Finally, the court relies on the ATF agent's testimony that "at one point . . . the [lower receiver] was part of a complete firearm" to conclude that the Government showed that Burning Breast's entire rifle traveled in interstate commerce. Maj. Op. at 9 (quoting Trial Tr. 111). But saying that the lower receiver was once a part of the Massachusetts rifle does not establish that Burning Breast's gun is that rifle. That is especially true when the ATF agent had already acknowledged that he didn't know the origin of any other part on Burning Breast's gun and the other evidence in this case all tended to show that the rifles were not the same. To the extent the ATF agent's testimony could be read as opining about the travel history of Burning Breast's whole rifle, his prior statements revealed that he had no basis to do that.

Without context, the court's selected quotes make it seem like the ATF agent knew Burning Breast's rifle was the Massachusetts rifle and it moved in interstate commerce. But the reality is that the ATF agent tried to bootstrap his limited knowledge about a single part into evidence about the whole rifle. The record does not support a reasonable inference that Burning Breast's gun moved across state lines.

The Government's whole case hinged on the lower receiver. That part is not a "receiver" under the regulation. And as for the statute, the lower receiver is not a weapon that will or is designed to shoot a bullet on its own. So it fails to meet the definition of a "firearm" in 18 U.S.C. § 921(a)(3)(A). And the Government presented

no evidence about whether the lower receiver "may readily be converted" to shoot a bullet. § 921(a)(3)(A); *see also United States v. Mullins*, 446 F.3d 750, 755–56 (8th Cir. 2006) (upholding a conviction where expert testimony established that the defendant's starter gun could be modified to shoot bullets in "less than an hour" with common tools and so that gun "may be considered 'readily convertible'"). So I would apply the rule of lenity and conclude that a lower receiver is not a "firearm" under the statute, either. Without more evidence that the firearm Burning Breast possessed traveled in interstate commerce, he could not have been convicted under § 922(g)(1) merely because he possessed a single interchangeable part that traveled across state lines.

There are other problems with this case that go to the core of separation of powers. An executive agency is not empowered to write and enforce "[its] own criminal code." *Gundy v. United States*, 139 S. Ct. 2116, 2131 (2019) (Gorsuch, J., dissenting); *see also Aposhian v. Wilkinson*, 989 F.3d 890, 898–99 (10th Cir. 2021) (Tymkovich, J., dissenting from denial of rehearing). As Judge Tymkovich explained, "[w]hen an agency can define criminal conduct, there is a genuine concern that 'if [they] are free to ignore the rule of lenity, the state could make an act a crime in a remote statement issued by an administrative agency.'" *Id.* at 899 (quoting *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 732 (6th Cir. 2013) (Sutton, J., concurring)). Justice Gorsuch recently expressed the same concern, asking how "ordinary citizens [can] be expected to keep up" if we defer to the agency in cases like this. *Guedes v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., statement regarding denial of certiorari).

Not only does the Government try to evade the rule of lenity by defining a term in a criminal statute, the court also lets it enforce that interpretation without batting an eye, dismissing the critical issue as a "red herring[]." Maj. Op. at 6. The Government also got away with misleading the jury about its own interpretation of the statute. Despite the ATF agent's knowledge that the lower receiver did not

-18-

contain all three components the ATF requires in a "receiver," he repeatedly called that single part "the firearm," and the Government referred to that testimony several times in closing arguments. *See* n.1, *supra*. The agent's testimony might have succeeded in getting the jury to speculate that a firearm crossed state lines, but "[s]peculation cannot be the basis for proof in the civil context[,] much less the basis for proof beyond a reasonable doubt." *United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006) (reversing a § 922(g) conviction because ATF agent expert testimony was too vague to establish that a gun traveled across state lines beyond a reasonable doubt).

As Justice Scalia reminded us, "legislatures, not executive officers, define crimes" and "[c]riminal statutes are for the courts, not the Government, to construe." *Whitman v. United States*, 135 S. Ct. 352, 352–53 (2014) (Scalia, J., dissenting from denial of certiorari) (cleaned up) (citation omitted). Deferring to the prosecuting branch's interpretations of criminal statutes "replac[es] the doctrine of lenity with a doctrine of severity." *Crandon v. United States*, 494 U.S. 152, 178 (1990) (Scalia, J., concurring in the judgment). And that is particularly salient in areas of criminal law where it "seems agencies change their statutory interpretations almost as often as elections change administrations." *Guedes*, 140 S. Ct. at 790 (Gorsuch, J., statement regarding denial of certiorari).[9]

Had the Government proven that Burning Breast's rifle or its complete receiver traveled in interstate commerce rather than just one part, that evidence may have been sufficient. *See United States v. Hill*, 835 F.3d 796, 800 (8th Cir. 2016) (holding that "ammunition assembled from components which had traveled in interstate commerce was in commerce for purposes of 18 U.S.C. § 922(g)(1)"). That wouldn't be hard to

_____

[9] *See, e.g.*, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720 (proposed May 21, 2021) (expanding the definition of "receiver" to include partial or incomplete receivers that "may readily be completed, assembled, converted, or restored to a functional state.").

show.  But where the Government fails to supply proof of a defendant's guilt beyond a reasonable doubt and the jury still convicts, we should reverse the conviction.

_____