# United States Court of Appeals

### For the Eighth Circuit

_____

No. 23-2490

_____

United States of America

*Plaintiff - Appellee*

v.

Juan D. Osorio, also known as Spexx

*Defendant - Appellant*

_____

No. 23-2728

_____

United States of America

*Plaintiff - Appellee*

v.

Jonathan M. Bravo-Lopez, also known as Shadow, also known as Jonathan Vravo

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: April 10, 2024
Filed: August 5, 2024

_____

Before SMITH, WOLLMAN, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This appeal arises from Juan D. Osorio and Jonathan M. Bravo-Lopez's convictions for the kidnapping which resulted in the death of Christian Escutia. The district court[1] sentenced Osorio and Bravo-Lopez to life imprisonment for their crimes. They now appeal, asserting several points of error. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

On April 3, 2017, Marco Sosa-Perea picked up defendant Bravo-Lopez in a blue Chrysler Pacifica minivan. The pair drank Modelo beer and smoked marijuana as they drove around. Later that day, after picking up defendant Osorio and Valeria Zapata-Delgado, the group proceeded to a downtown area of Kansas City, Missouri where they smoked more marijuana. While there, Zapata-Delgado received a message from Escutia, who she knew sold marijuana. After seeing the message, Osorio directed Zapata-Delgado to message Escutia back and set up a deal to purchase yet more marijuana. He mentioned that Escutia owed him $300. Escutia told Zapata-Delgado to come to his house and let him know when she was outside. After setting up the deal, Appellants and Sosa-Perea dropped Zapata-Delgado off at her home. Osorio told Zapata-Delgado that he had to talk to Escutia about something personal, that he would pick her up afterwards, and that she was to message Escutia to go to the blue Chrysler once Osorio arrived. Later, after Osorio called her, Zapata-Delgado messaged Escutia to say that she was outside.

_____

[1]The Honorable Roseann A. Ketchmark, United States District Judge for the Western District of Missouri.

After driving to Escutia's home and waiting for him to approach, Appellants forced Escutia inside the minivan at gunpoint. Sosa-Perea, still in the driver's seat, drove the group across the Kansas border at Bravo-Lopez's direction. Osorio hit Escutia with his gun while Bravo-Lopez pointed his own at Escutia. The group eventually arrived at an industrial location, where Osorio and Escutia exited. After Osorio got back into the van, Bravo-Lopez retrieved a gun from the minivan's center console and exited. Sosa-Perea then heard what he believed to be two gunshots before Bravo-Lopez got back in the minivan. Bravo-Lopez instructed Sosa-Perea to drive off. As the group returned to Missouri, Osorio threw bullet casings and Escutia's phone out of the window while he cleaned blood from the back of the minivan with a rag.

Zapata-Delgado went to the police to talk about what happened after becoming concerned that Escutia was missing. One of Escutia's neighbors also witnessed the kidnapping and had contacted the police. Officers recovered security camera footage of the kidnapping from a nearby residence.

Bravo-Lopez was arrested and later interviewed by Detectives Erica Oldham and Brad Thomas of the Kansas City, Missouri Police Department. Bravo-Lopez was read his Miranda[2] rights, stated that he wanted to talk, and signed a waiver form. After initially denying involvement in Escutia's disappearance, he admitted to being present in the minivan with Osorio, Sosa-Perea, and Escutia, although he denied shooting Escutia. During a break in the interrogation, Bravo-Lopez assisted officers in locating Escutia's body, which, at that time, had not been found. An autopsy revealed three bullet wounds to Escutia's head and one to his arm. A Modelo beer can recovered near the body tested positive for Osorio's DNA. Security camera footage from a business near where Escutia's body was found also showed a blue Chrysler Pacifica coming and going the night of April 3. Osorio and Sosa-Perea were subsequently arrested.

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

A grand jury charged Bravo-Lopez, Osorio, and Sosa-Perea with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(a)(1) and (c), and kidnapping resulting in death, in violation of 18 U.S.C. §§ 2 and 1201(a)(1).[3] Additionally, the grand jury charged Osorio with being an alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2), and charged Bravo-Lopez with unlawful re-entry, in violation of 8 U.S.C. § 1326(a).

Before trial, Bravo-Lopez moved to suppress the incriminating statements he had made to the detectives after his arrest, asserting that he did not voluntarily, knowingly, and intelligently waive his Miranda rights. A magistrate judge[4] held an evidentiary hearing on the motion at which detectives Oldham and Thomas testified, as well as Dr. Antolin Llorente—a neuropsychologist who testified to Bravo-Lopez's borderline intellectual functioning. The magistrate judge found that Bravo-Lopez voluntarily, knowingly, and intelligently waived his Miranda rights and recommended denying the motion. The district court adopted the report and recommendation in full and denied the motion.

Sosa-Perea entered into a plea agreement with the Government, under which he agreed to plead guilty to conspiracy to commit kidnapping in exchange for the dismissal of the kidnapping resulting in death charge. Because kidnapping resulting in death carries a death or mandatory life sentence, see 18 U.S.C. § 1201(a), and because conspiracy to commit kidnapping carries only a possible life sentence, see id. § 1201(c), Sosa-Perea avoided a more serious potential punishment.

---

[3]The grand jury also charged the three men with using a firearm to commit murder, in violation of 18 U.S.C. §§ 2 and 924(c) and (j)(1). On the Government's motion, the district court dismissed these charges before trial.

[4]The Honorable Lajuana M. Counts, United States Magistrate Judge for the Western District of Missouri.

-4-

During the ten-day jury trial—in which Sosa-Perea testified extensively—the Government requested that the district court prohibit Appellants from referring to the mandatory life sentence Sosa-Perea avoided with his plea deal, reasoning that it was prejudicial, confusing for the jury, and that sentencing is a question for the judge. The district court agreed that reference to the mandatory nature of the sentence could distract the jury. Over Appellants' objection, the district court ordered the parties not to "utilize the word mandatory" on cross-examination or during arguments and to use the phrase "facing a life sentence" instead. Sosa-Perea testified about his plea deal and confirmed that he "would have been facing a life sentence if convicted of" the dismissed count.

The jury returned a guilty verdict on all counts. The district court denied Appellants' subsequent motions for judgment of acquittal. The district court sentenced Bravo-Lopez to life imprisonment for conspiracy to commit kidnapping and kidnapping resulting in death, and 24 months' imprisonment for illegal re-entry, to be served concurrently. It sentenced Osorio to life imprisonment for kidnapping resulting in death, 600 months' imprisonment for conspiracy to commit kidnapping, and 120 months' imprisonment for being an alien in possession of a firearm, also to be served concurrently. Both Osorio and Bravo-Lopez appeal, asserting several points of error.

II.

Osorio and Bravo-Lopez both challenge their convictions based on an alleged violation of their Confrontation Clause rights. They assert that the district court erred in instructing their attorneys not to "utilize the word mandatory" on cross-examination of Sosa-Perea or during jury argument when referring to the potential mandatory life sentence Sosa-Perea avoided with his plea deal. "When reviewing a district court's limitations on cross-examination, we apply an abuse of discretion standard; we will reverse only if a clear abuse of discretion occurred and if that error prejudiced the defendant." United States v. Campbell, 986 F.3d 782, 794 (8th Cir. 2021).

"The Sixth Amendment's Confrontation Clause affords criminal defendants the right to be 'confronted with the witnesses against him.'" Id. (citation omitted). The "defendant's opportunity to cross-examine" is "[a]t the heart of the Clause," but it is not an unlimited right. Id. District courts have "wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). To establish that a limitation on cross-examination violated the Sixth Amendment, the defendant must "show[] that a reasonable jury might have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue his proposed line of cross-examination." Id. (citation omitted).

Here, the district court was concerned that use of the term "mandatory life" would "distract[]" the jurors from their role. Appellants do not dispute that this justification is permissible. Rather, they assert that the jury would have received a significantly different impression of Sosa-Perea's credibility had they been able to reference "mandatory life" because there is a difference between "facing a life sentence" and a "mandatory life" sentence. But Appellants point us to no authority demonstrating that this difference in wording would have resulted in the jury drawing a *significantly* different impression of Sosa-Perea's credibility. Moreover, we have found no abuse of discretion in situations with greater disparities between the permitted and the proposed lines of cross-examination. See, e.g., United States v. Wright, 866 F.3d 899, 903, 908 (8th Cir. 2017) (finding no abuse of discretion when the district court prohibited reference to "nearly a life sentence" but permitted reference to "facing a mandatory minimum penalty that could cost [the witness] decades of his life"); United States v. Walley, 567 F.3d 354, 360 (8th Cir. 2009) (holding that "five-year sentence" would not have given the jury a significantly different impression of witness's credibility compared to "significant sentence"). "Depriving the jury of the slight marginal utility of knowing about the mandatory" nature of the sentence "simply does not equate to a constitutional violation." United

States v. Larson, 495 F.3d 1094, 1110 (9th Cir. 2007) (en banc) (Graber, J., concurring in part, specially concurring in part).

Nor are we persuaded by Appellants' argument that the district court should have permitted the "mandatory" line of cross-examination because Sosa-Perea had "already received a benefit at the time of his testimony." In support of this argument, Appellants cite United States v. Roan Eagle, 867 F.2d 436 (8th Cir. 1989), and United States v. Caldwell, 88 F.3d 522 (8th Cir. 1996). Those cases "both held that it was error for a district court to limit cross-examination about the sentence of a cooperating witness." Walley, 567 F.3d at 359. Specifically, "[i]n Roan Eagle, the witness already had received the benefit of a reduction in charges" by the time she cooperated. Id. Appellants suggest that this factor is "critical" and that the district court must therefore have erred because Sosa-Perea had also received the benefit of a reduction in charges by the time he testified. We disagree. Appellants direct us to no case identifying this factor as "critical." Nor have we ever suggested that this factor automatically entitles a defendant to their preferred line of cross-examination. Furthermore, Roan Eagle and Caldwell are distinguishable on their facts. In Roan Eagle, "the district court . . . did not offer the defendant the opportunity to phrase the [proposed] question differently so as to convey the severity of the potential sentence," and in Caldwell the district court "allowed only a vague suggestion that the dropped charge," which carried a mandatory minimum penalty of ten years' imprisonment, "may have called for 'time in the penitentiary.'" Wright, 866 F.3d at 907 (citation omitted). Those limitations are both more restrictive than the relatively slight limitation imposed here, which neither failed to convey the severity of the sentence Sosa-Perea faced, nor allowed the parties to refer to it with only vague suggestions. "[N]one of our cases mandate that district courts always allow unfettered questioning about potential life sentences faced by cooperating witnesses." Id.

Appellants have not shown that a reasonable jury might have received a significantly different impression of Sosa-Perea's credibility had they learned of the mandatory nature of the sentence he avoided. We therefore conclude that the district

court did not abuse its discretion in limiting cross-examination and argument on this point.

## III.

Osorio argues that the district court erred in denying his motion for judgment of acquittal, asserting that there was insufficient evidence to prove that he intended that the kidnapping result in death. "But under § 1201(a), the government must prove [Osorio]'s knowledge and intent only with respect to the kidnapping. The government also must prove that the kidnapping *caused* the victim's death, but not that [Osorio] intended or knew that death would result." United States v. Simpson, 44 F.4th 1093, 1099 (8th Cir. 2022), cert. denied, 143 S. Ct. 813 (2023). The district court did not err in denying the motion—as set forth below, infra Section V, there is ample evidence of Osorio's knowing and intentional participation in the kidnapping and that the kidnapping resulted in Escutia's death.

## IV.

Bravo-Lopez argues that the district court erred by refusing to instruct the jury on his diminished-capacity defense. At trial, Bravo-Lopez argued that his "borderline intellectual functioning"—including, among other things, his low IQ, brain damage, and poor memory—prevented him from forming the specific intent to commit the kidnapping or enter into the conspiracy. Bravo-Lopez timely proposed an instruction outlining this defense.[5]

---

[5]The proposed instruction read as follows:

An issue in this case is whether, at the time the acts charged in Counts One and Two, were committed, Jonathan Bravo-Lopez had a mental disease or defect that would have prevented him from having the necessary state of mind to knowingly and purposefully commit the crimes. Specifically, whether his borderline intellectual functioning, impaired memory, mental illness, executive dysfunction, and encephalopathy, individually or as a whole, made it impossible for Mr.

-8-

"We review the rejection of a defendant's proposed instruction for abuse of discretion . . . ." United States v. Burning Breast, 8 F.4th 808, 815 (8th Cir. 2021). "This court has said in many cases that '[a] criminal defendant is entitled to a theory-of-defense instruction that is timely requested, correctly states the law, and is supported by the evidence.'" United States v. Christy, 647 F.3d 768, 770 (8th Cir. 2011) (alteration in original) (citation omitted). But a defendant's entitlement to a theory-of-defense instruction is not limitless:

> Even where the court declines to give an instruction on a theory of defense that is supported by the evidence, there is no error if the instructions as a whole, by adequately setting forth the law, afford counsel an opportunity to argue the defense theory and reasonably ensure that the jury appropriately considers it.

Id.

Here, the district court afforded Bravo-Lopez the opportunity to argue his diminished-capacity defense, and he extensively pursued that opportunity during closing arguments. Further, Bravo-Lopez does not argue that the instructions given failed to adequately set forth the law. See United States v. Garrett, 898 F.3d 811, 815 (8th Cir. 2018) (finding no error when the district court instructed the jury on knowledge and intent elements without objection, and where defense counsel argued the theory of defense "at length"). Therefore, assuming without deciding that

Bravo to have a purposeful and knowing state of mind necessary to commit the crimes charged in Counts One and Two. Evidence that the defendant acted under a mental disease or defect may be considered by you, together with all the other evidence, in determining whether or not Mr. Bravo-Lopez could have the mental state[] required by law under the elements of Counts One, and Two. If you find that Mr. Bravo-Lopez was operating under a mental disease or defect at the time the crimes charged in Counts One and Two were committed, and you further find that because of his mental disease or defect he was not able to form the knowing intent required by the elements of those crimes, you must find Mr. Bravo-Lopez not guilty of those Counts.

-9-

Bravo-Lopez's proposed instruction correctly stated the law and was supported by evidence, we conclude that the district court did not err in declining to give it. Christy, 647 F.3d at 770.

V.

Next, Bravo-Lopez argues that the district court erred in denying his motion for judgment of acquittal based on the insufficiency of the evidence that he conspired to kidnap Escutia. He asserts that the evidence at trial proved a spontaneous kidnapping resulting from panicked behavior after the drug-buy, but not a conspiracy. As Bravo-Lopez sees it, there was "no discussion of kidnapping, no meeting of the minds, and no understanding of the[] purpose to kidnap." "We review 'the denial of a motion for a judgment of acquittal based on the sufficiency of the evidence *de novo*'" and will "affirm unless, viewing the evidence in the light most favorable to the Government and accepting all reasonable inferences that may be drawn in favor of the verdict, no reasonable jury could have found the defendant guilty." United States v. Soto, 58 F.4th 977, 981 (8th Cir. 2023) (citations omitted).

To prove that Bravo-Lopez conspired to kidnap Escutia, "the government had to present evidence that [Bravo-Lopez] entered an agreement with one or more other persons to commit the kidnapping." United States v. Williams, 95 F.3d 723, 732 (8th Cir. 1996). Contrary to Bravo-Lopez's suggestion, "[t]he government meets its burden if it proves that the defendants acted in concert to achieve a common goal, or acted with a tacit understanding," United States v. Agofsky, 20 F.3d 866, 870 (8th Cir. 1994) (citation omitted), and it may do so "wholly by circumstantial evidence and inference," Williams, 95 F.3d at 732. A discussion is not required. See United States v. Hudspeth, 525 F.3d 667, 678 (8th Cir. 2008) ("A conspiracy conviction . . . does not require evidence of an explicit agreement.").

Here, Zapata-Delgado testified that, after she arranged the purchase of marijuana from Escutia at the direction of Osorio, the group dropped her off at home and that she was not happy about it. During that journey, Zapata-Delgado

-10-

remembered Osorio asking Bravo-Lopez if he knew Escutia and Bravo-Lopez nodding his head to indicate "yeah." The fact that Zapata-Delgado was dropped off at home despite the group having only discussed buying marijuana surprised Sosa-Perea. Sosa-Perea testified that, when the group arrived at Escutia's home, Bravo-Lopez and Osorio forced Escutia into the minivan with their guns pointed at his ribs, screaming at him to "get in the car" as he repeatedly implored them, "Don't do this." Security camera footage from a nearby residence was admitted into evidence and showed two individuals—later identified as Appellants—forcing Escutia into a blue Chrysler minivan at gunpoint. Sosa-Perea also testified that, once in the minivan, Bravo-Lopez read messages on Escutia's phone, pointed his gun towards Escutia while Osorio hit him, and directed Sosa-Perea where to drive. Bravo-Lopez and Osorio both exited the vehicle with Escutia at the industrial location where his body was later recovered.

Presented with these facts, a reasonable jury could have found that Bravo-Lopez and Osorio conspired to kidnap Escutia because they acted in concert towards that aim. See Agofsky, 20 F.3d at 870. On the day of the kidnapping, Osorio confirmed with Bravo-Lopez that he knew Escutia. Both men exited the minivan once at Escutia's home and forced him back inside the minivan at gunpoint, both screaming at Escutia to "get in the car." Both men directed others to help achieve the kidnapping; Osorio directed Zapata-Delgado to arrange the drug purchase and Bravo-Lopez directed Sosa-Perea where to drive. Both men kept their firearms trained on Escutia while in the minivan, and both exited the minivan at the industrial location in the moments before Escutia was killed. A reasonable jury could have inferred that arranging to purchase marijuana from Escutia was pretense given that Zapata-Delgado was surprisingly dropped off at her home after facilitating the deal and having smoked with the group earlier that day. The district court did not err in denying Bravo-Lopez's motion for judgment of acquittal.

-11-

Finally, Bravo-Lopez argues that the district court erred when it denied his motion to suppress the incriminating statements he made to detectives after his arrest. He asserts that the detectives "glossed over" his Miranda rights and that the statements were coerced, in violation of the Due Process Clause of the Fourteenth Amendment. In denying the motion, the district court concluded that Bravo-Lopez voluntarily, knowingly, and intelligently waived his Miranda rights. Bravo-Lopez did not raise a Due Process Clause argument in his motion to suppress, and the district court did not address the issue.[6]

We review the district court's conclusion as to the Miranda waiver de novo and its underlying factual findings for clear error. United States v. Figueroa-Serrano, 971 F.3d 806, 814 (8th Cir. 2020).

> There are "two distinct dimensions" to whether a suspect's waiver of his Miranda rights was voluntary, knowing, and intelligent. First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." The government bears the burden of proving, by a preponderance of the evidence, the validity of a Miranda waiver.

Id. (citations omitted).

Bravo-Lopez does not convince us that the Government failed to prove by a preponderance of the evidence that he voluntarily, knowingly, and intelligently waived his Miranda rights. First, Bravo-Lopez asserts that a detective minimized

---

[6]In one paragraph of Bravo-Lopez's motion to suppress, he mentioned the "[d]ue process require[ment] that confessions are voluntary." But he did so when outlining the requirements for Miranda waiver and without developing a separate Due Process Clause argument.

the importance of his <u>Miranda</u> rights by stating, "we've got this little thing called the [C]onstitution," and that only 34 seconds were spent advising him of them. But whether Bravo-Lopez understood the <u>Miranda</u> warnings is a question of fact that we review for clear error. See <u>Bell v. Norris</u>, 586 F.3d 624, 630-31 (8th Cir. 2009). Bravo-Lopez points to nothing in the record demonstrating that the district court clearly erred when concluding that he understood the warnings. He does not argue, for example, that 34 seconds is an inadequate length of time for him to have understood the rights he was waiving. He asserts that he was not asked "if he would better understand the rights in Spanish" but does not argue that he was unable to understand English. He also asserts that he was not given the "chance to read [the <u>Miranda</u>] rights himself," but he does not explain why the district court clearly erred in finding that he "had the opportunity to read the [<u>Miranda</u> Warning and Waiver] form when it was handed to him."

Next, Bravo-Lopez points to the unremarkable fact that, prior to his interrogation, he was alone and his feet were shackled. "[U]nder the circumstances, this routine procedure did not qualify as a deceptive or coercive police tactic." <u>Figueroa-Serrano</u>, 971 F.3d at 814. Bravo-Lopez also asserts that he had not eaten since the morning, but he does not challenge the district court's finding that "[t]hroughout the interview, [he] was offered and accepted water, snacks, and restroom breaks."

Bravo-Lopez also points to Dr. Llorente's testimony at the suppression hearing, emphasizing that, in Dr. Llorente's opinion, his "intellectual disabilities and other maladies" prevented him from understanding what rights he was waiving. The district court did not clearly err when concluding otherwise. Bravo-Lopez does not rebut the district court's finding that, based on its review of the video of the interrogation, he "appeared able to comprehend what was transpiring and to communicate effectively with the detectives." Moreover, the district court found the detectives credible when they testified that nothing about Bravo-Lopez suggested that he was unable to understand them. While Bravo-Lopez complains that the detectives are not medical professionals, the district court was permitted to credit

their testimony because "[w]e consider the totality of the circumstances in determining whether a suspect's waiver is valid." Id. (citation omitted).

Finally, "[e]ven if a suspect has a somewhat diminished capacity to resist coercion due to a mental defect . . . a Miranda waiver will not be invalidated on that basis if there is no evidence of police coercion." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011). In arguing that he did not voluntarily, knowingly, and intelligently waive his Miranda rights, Bravo-Lopez points to nothing in the record indicating police coercion.[7]

Bravo-Lopez separately argues that his statements were coerced, in violation of the Due Process Clause. His failure to raise this argument below could either be construed as waiver or forfeiture, but only the latter would leave the issue reviewable on appeal. See United States v. Murdock, 491 F.3d 694, 698 (7th Cir. 2007) (explaining that defendant's failure to raise a Due Process argument before the district court when challenging the validity of his Miranda waiver could be construed as unreviewable waiver or reviewable forfeiture, the latter of which results in plain-error review). Assuming without deciding that the issue was forfeited and is therefore subject to plain-error review, no additional facts raised in Bravo-Lopez's Due Process argument demonstrate that his Miranda waiver was involuntary or that the detectives coerced his statements in violation of the Due Process Clause. The additional facts asserted by Bravo-Lopez are that the detectives used "physical punishment," detained him for four hours before questioning began, and questioned

---

[7]"Obviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." United States v. Astello, 241 F.3d 965, 967 (8th Cir. 2001). But "questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." Id. (citation omitted). Bravo-Lopez does not argue that the detectives' interrogation tactics—such as "telling defendant Bravo-Lopez that they knew he was not the bad guy"—overbore his will. Rather, he asserts, without further argument or elaboration, that the tactics "were more likely to overcome his will . . . given his mental health."

him for eight hours, and that he lacks formal education, having dropped out of school in the ninth grade. We address each in turn.

Bravo-Lopez's allegation of physical punishment is unsubstantiated hyperbole. What Bravo-Lopez identifies as "physical punishment" is "sleep and food deprivation." As discussed, Bravo-Lopez fails to address the district court's finding that he "was offered and accepted water, snacks, and restroom breaks." He also fails to address the district court's finding that he told detectives that he napped in the four hours preceding the interrogation. We are also unpersuaded by Bravo-Lopez's assertion that the detectives subjected him to physical punishment by holding him in an interrogation room that was "small . . . with a metal desk and a few plastic chairs": a State does not deprive a "person of life, liberty, or property, without due process of law" by interrogating them in a room with limited accoutrements. U.S. Const. amend. XIV, § 1; cf. Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973) (explaining that "the use of [a] confession offends due process" when the suspect's "will has been overborne and his capacity for self-determination critically impaired").

Nor does the approximately eight-hour length of Bravo-Lopez's interrogation demonstrate police coercion. Even if we were to include—for the sake of argument—the four hours in which Bravo-Lopez was napping, twelve hours of interrogation falls short of the thirteen hours that we have found "not unconstitutional per se" where, as here, "a crime victim has disappeared and may still be alive." Williams v. Norris, 576 F.3d 850, 868-69 (8th Cir. 2009). At the time of Bravo-Lopez's interrogation, Escutia's body had not been found, and the interrogation was paused for approximately two hours while detectives drove around with Bravo-Lopez searching for him. See id. at 869 (concluding that the defendant's will was not overborne and noting that he "received a two-hour respite during [a] car trip").

Bravo-Lopez's lack of education does not demonstrate police coercion either. Although he may have dropped out of school in the ninth grade, Bravo-Lopez

-15-

demonstrated mental acuity by modifying the story he told the detectives as they revealed more evidence against him. Bravo-Lopez initially told the detectives he did not know Escutia, then that he had seen him eight days ago, and then that he was present in the minivan with Osorio, Sosa-Perea, and Escutia. As the district court found, "[r]ather than presenting as a low-functioning individual, the defendant presented himself as an individual who was being cagey." See United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (concluding that defendant's Miranda waiver was knowing and intelligent despite his low IQ and noting that he "acted in a manner more consistent with a person attempting to avoid being caught than a person who did not know what he was doing"). Bravo-Lopez is not the rare case where self-incriminating statements were "'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda." Dickerson v. United States, 530 U.S. 428, 444 (2000) (citation omitted). The district court did not err in concluding that Bravo-Lopez voluntarily, knowingly, and intelligently waived his Miranda rights, and we find no error in the district court's denial of the motion to suppress.

VII.

For the foregoing reasons, we affirm.

_____